## B. C. CONNER v. STATE.

No. A-9552.   April 21, 1939.
(89 P. 2d 991.)

Bond & Bond, of Duncan, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for defendant in error.

DAVENPORT, J. The defendant, B. C. Conner, was by information charged with the larceny of one animal of the bovine species, a bull, belonging to J. W. Ardrey, was tried in the district court of Stephens county, convicted, and sentenced to serve a term in the state penitentiary of five years. Motion for a new trial was filed, considered, overruled, exceptions saved, and the defendant has appealed.

J. W. Ardrey states:

"I live 20 miles east and three miles south of Marlow, engaged in farming. About the 13th of October, 1937, I was the owner of a bull, a white faced bull. The bull was not in good shape, weighed about 600 pounds, would be my guess, kinda' pale red, white faced bull, and didn't have any horns, had a 'Y' brand run on it. I last saw the bull on the 6th of October, 1937. At that time he was there around the place with my cows. When I missed him I began searching for him; on the 18th day of October, 1937, I heard of him. He was supposed to have been seen on the 12th. I never did find the bull. I went to Oklahoma City, but I did not find him alive. I found the hide of the bull in a hide house there in Oklahoma City. It was known as the

Gruendler Hide House. Brooks Hervey and my boy was with me, and also Mr. Jones. We found a record where he had been sold to the butcher. We went to the hide house, and the hides was removed by some negroes into stacks. I examined each hide as they pitched them out. I watched for the flesh marks on the hide. The hide, here, is the hide we found in the hide house. I identified it as the hide off my bull. I examined it first for flesh marks. Yes, sir, this is the hide that came off my bull. The negroes handled about 437 hides before they came to this one. This bull of mine was darker in front, and had a little white spot, here, by his shoulder, and a little white spot back there (indicating). He was a bull I had raised. The hide at the time we found it was more pliable than it is now. It was stretched out, the brand kinda' like this (pointing it out to the jury). Right there is the brand. At that time the hide was soft. I have used that brand for about twelve years. I placed the brand on the left side behind the left shoulder of the animal, and that is where this bull was branded. He was about six or eight months old when he was branded. He was branded at Jess Gann's. Jess run the brand on him. My son and several others were there at the time. Mr. Gann was also branding some of his cattle. I did not give any one permission to take that bull away from my premises, nor did I give any one permission to take it to Oklahoma City."

On cross-examination the witness stated in substance the same facts that he had stated on his direct examination.

Bryant Ardrey, his son, stated that he was twelve years of age, lived with his father, that he was in the eighth grade in school, he knew the bull his father had raised, and in substance stated that he went with Mr. Hervey and his father to the hide house where they located the hide which he claims, and the hide which had been taken from the bull of his father's that was missing. The hide was soft at the time they saw it. He also testified as to the fact of the bull being branded by Mr. Gann, and identified the hide taken from the hide house as belonging to his father's bull.

Earnest Ruth, testifying on behalf of the state, stated:

"I live 21 miles east of Marlow, about 100 yards off the highway. I know Mr. Ardrey. I live about two miles

from Mr. Ardrey northwest, I mean southwest. I know Buster Conner. He lives northwest of me. It is a mile north of where I live, where you turn to go towards Buster Conner's place. Going from my place to Buster's, I go a mile north and then back west. On the 12th of October, 1937, I was pulling bollies just west of the section line. I fixed the day, because I was expecting to go to work on the road, and I noticed the calendar, and wanted to see how long I had to pull bollies, and I noticed the calendar, and it was the 12th. I saw a bull about 4:00 o'clock in the afternoon of the 12th of October, 1937. He came to our place with our cows. When our cows went into the pasture he tore through the stalk field. I heard him bawling; I looked over there; I couldn't tell whose bull it was. I saw Mr. Ardrey in a few days. It looked something like Mr. Ardrey's bull. I never saw the bull after that afternoon. I told Mr. Ardrey a few days after that where I had seen the bull. I live around two miles from Buster Conner's; but across the section line straight across, it would be about a mile and one half. When I saw the bull he was coming from the west. I live one mile from the Stephens county line, in Stephens county."

On cross-examination the witness stated he could not tell whose bull it was, that when he first saw the bull he was on the main highway, "The last time I saw him, he was going east."

Cleo Ruth, testifying for the state, stated that he was 20 years of age, living in the Burrows High neighborhood.

"I know J. W. Ardrey. I know Buster Conner. The road Buster travels coming down to the section line is just west of our place. I was pulling bollies that afternoon with my brother Earnest. The way I fix the date, my brother was supposed to go to work the 20th. We were looking at the calendar that day, and it was the 12th. We were pulling bollies about a quarter of a mile from the highway. One of our cows had been missing, and I saw her coming down the road, and I saw the bull with her, and I called my brother's attention to that fact at the time. I took it to be Mr. Ardrey's bull. I have never seen that bull since that afternoon."

Brooks Hervey, testifying for the state, stated:

"My name is Brooks Hervey. I am sheriff of Stephens county. Mr. Ardrey came to my house and talked to me about a bull that he had lost or had disappeared. I went with Mr. Ardrey to Oklahoma City; I made three trips. I was at the hide house with Mr. Ardrey and his son when the hides were examined. They moved something like four hundred or more before they came to a hide that Mr. Ardrey identified by the flesh marks and brand mark as being the hide off his bull."

Several documents, including the truck waybill and the document purporting to be signed by B. C. Conner at the time the bull was delivered to the stockyards and other documents that the defendant had signed at different places on legal documents, were exhibited to B. B. Hickman, who is admitted to be qualified as an examiner of questioned documents, and Mr. Hickman, after carefully examining the different documents presented to him, and after having taken the most of them through his laboratory where he had the signatures enlarged, testified positively that the signatures on the papers at the stockyards, in his opinion, were the same signature as B. C. Conner's in the documents presented for identification.

The foregoing is the substance of the testimony for the state.

The defense of the defendant is in the nature of an alibi.

Mrs. B. C. Conner, wife of the defendant, testifying for the defendant, stated that she and B. C. Conner had been married nearly 12 years. Buster did not go to Oklahoma City on the night of the 12th of October, 1937. He was never away from home after his father got sick. His father was taken sick on the 26th day of September and died on the 8th day of October, and was buried on the 9th. Buster did not leave home for several days after his father was buried. He was there every night for at least a week after his father was buried.

On cross-examination the witness stated Buster hauled

cattle to the stockyards pretty often in the fall. He did not take cattle often to the stockyards in Oklahoma City to sell.

"We had cows he carried up in the fall. I do not know the date he carried them; I think along in August, he carried some up there. I do not know the exact number. I do not know whether he carried any cattle in July, September or November. Buster was not away from home at night during the month of October. I fix the time about the 12th or 13th of October, Buster was at home by the fact that his father died, and was buried on the 9th, and he did not leave for several days and nights after the 9th."

Mattie Walker testified for the defendant and stated that she knew the defendant and his wife, that the defendant's father was buried on October 9.

"I went to the defendant's home the 13th of October to get Mr. Conner to take me to a doctor. It was about 7 or 8 o'clock in the morning of the 13th. Mr. Conner was at home. We were having some rainy, smoky weather. It had rained the day before all day, on the 12th. He used his pick-up and took me home when I got back."

On cross-examination the witness stated that:

"Buster is no relation to me. His father married a niece of my father's. It was about the 13th day of the month, because I wrote a check that day. I remember distinctly that I gave the doctor the check on the 13th."

J. P. Southern was called as a witness for the defendant and stated that he lived in the northwest corner of Stephens county; had known the defendant about 23 years; knew the defendant's father.

"I live just north of Buster's home, about a quarter of a mile. His pick-up sets on the north side of Buster's home, and I could see it from my place. I did not miss the pick-up. The exact dates I do not know. I did not keep up with the dates. After his father's death it was there every morning and night, something like a week or two, all the time; every time I looked over there I could see it sitting there. I could not see it after dark. I saw the pick-up there on the 13th. I do not know the exact hour, but all through the day if I looked over there."

Joe Estes testified for the defendant as follows:

"I live 20 miles east of Marlow. I know B. C. Conner; Buster they called him. I have known him 12 or 15 years. I have been in jail up here for driving a car without a license. I remember the occasion of Mr. B. C. Conner's father dying. I live about a quarter of a mile from defendant B. C. Conner, and I was over there the next day after his father's death. I went over there with Mrs. Walker. She wanted Mr. Conner to take her to the doctor. I was over there when she was there. It had rained the day before, on the 12th. I saw Mr. Conner the afternoon of the 12th. We had taken my father down to the school house. This was along late in the afternoon. Mr. Conner brought me back home, and then went on back to his home. I do not know whether he went anywhere else that afternoon. I did not tell the officers when they questioned me that I was pretty full, and did not remember what happened. I told the officers about Buster and I going down to the store."

A Mr. Myers, testifying for the defendant, stated:

"I live 20 miles east and two miles south of Marlow. I have lived there about 9 years. I know Pete Ardrey. I have known him about 5 years. I was at Gann's when the animals were branded. They put a 'Y' brand on a bull about 6 or 8 months old. I helped do the branding. We branded a 'Y' on a whitefaced bull with a little white on the back of his neck. I did not notice any white on his back."

The witness examined the hide and stated:

"There is a little difference in the marks on the hide, and the bull we branded. Here's a white spot—wasn't no white on Ardrey's bull. Mr. Ardrey's bull did not have any white on its back. I fed him several times. He run with the Gann's cattle quite a bit. During the time I fed him, I did not see any white spot on his back."

On cross-examination the witness stated:

"I am not related to the defendant Conner. I am his brother-in-law now. I married his wife's sister. This bull was branded sometime in May, and I would judge it was about 6 or 8 months old at the time. We put a 'Y' brand —used a branding iron. This branding iron did not have the 'Y' on it. They had to take the iron up and stick it in

another place in order to make the 'Y.' Jess Gann's brand is a 'T.' I can't find anything on the hide to compare with the brand we put on it. There wasn't any white marks on the back of this bull—a little white on the shoulder."

Homer Robertson, testifying for the defendant, stated:

"My home is 21 miles east and two miles north and two and one-half east of Marlow. I have lived there 16 years. I came in from Western Texas on the 13th of October at noon. I left Texas at 12 o'clock on the 12th and got home on the 13th. Coming back it rained straight down, raining all the way from Texas to my home, slow drizzling rain from Texas to 20 miles east of Marlow. The roads were muddy and slick."

Joe Conner, testifying for the defendant, stated:

"I am a half brother of the defendant. I live about a quarter of a mile east and a little north from him. I know his pick-up. I looked at the tag on the pick-up this morning. The license number is 669-562. This is the tag number that was on the pick-up in October, 1937. After my father's death on the 8th of October, 1937, I was back and forth to Buster's home practically every day for I would say 15 days. I saw Buster at home every day I was there."

On cross-examination the witness stated:

"My address is Route 1, Foster, Oklahoma. Buster was at home during the 12th, 13th, and 14th. I can identify the tag number, because I had seen it every day, and wrote it down so that I would be sure of having it correct. I hauled some cattle to Oklahoma City. I usually hauled Mr. Southern's cattle up there, and sold them to Jake Simms. Jake grew up in Garvin county."

J. W. Ardrey was recalled by the defendant for further cross-examination and stated:

"The brand we put on the bull, from the fork down to the end was probably three or four inches. The prong was probably three inches. I know Jake Simms; have known him since I was a boy. He was down around his brother's who lives within a half mile of me."

Cleo Ruth was recalled by the defendant for further cross-examination:

"I picked bollies on the afternoon of the 12th of October, 1937. It was pretty weather. It hadn't rained out where I was, on the 12th."

The defendant, B. C. Conner, testifying in his own behalf, stated:

"I live about 21 miles east of Marlow. I have lived there 33 years. My father died on the 8th of October, 1937; was buried on the 9th. I was not in Oklahoma City for several days after my father's death. I was practically around home all the time. The number of the tag given by the witness is the number of the tag that was on my pick-up during the month of October. I did not steal Mr. Ardrey's bull, nor did I haul the bull to Oklahoma City on the 12th or 13th. I never handled the bull. I just saw him down at Gann's when they were branding him as a calf. I was not in Oklahoma City, and did not go to the stockyards on the night of the 12th or morning of the 13th. I did not know anything about the taking of Mr. Ardrey's bull. Mrs. Walker came to my house on the 13th. It had practically been raining all day and the day before. Mrs. Walker wanted me to take her to the doctor. I did not take her, but told a boy living on the place over there, and I got him to take her. His name was Estes. She came to my house about 7:00 or 7:30 in the morning. I never saw the waybill that was introduced here until the day of the preliminary hearing. I did not fill it out, nor did I write what is on the waybill."

On cross-examination the witness stated that he had served a term in the federal penitentiary or jail for violation of the prohibition laws.

"I have known Jake Simms at least 3 years tolerably well. I did not know him very well up until 3 years ago. I have been buying and selling a few cattle at Oklahoma City for the past 3 or 4 years. I have sold some of the cattle to Jake Simms, but not all of them. I did not go to Jake Simms or the bank to find out whether or not the check had been cashed. I had no idea how to start in order to locate the man. I knew the man, who works around Jake Simm's commission company. I do not have any of these people around there as witnesses. I knew that Mr. Ardrey had a white faced bull. I have not seen the bull since he was branded. I didn't do anything on the 13th of October, 1937. I took Mrs. Wallace home for one thing. I could not

say whether I slept or not. There might be people out in that neighborhood who could imitate my signature, but I do not know any of them that can. I never had any white faced cows or steers either."

Exhibits 4, 5, and 6 were introduced for the purpose of the signatures only, and the defendant admitted that his signature was on each of them. "I signed the appearance bond for the court."

The signature on the state's exhibit 9 was introduced in evidence. The defendant admitted signing the exhibits that were identified carrying his signature, to everything, excepting the papers at the stockyards which he claims he did not sign.

On redirect examination the defendant stated that he came along the section line road on the 12th, and that he did not see any one pulling bolls on that date, for the reason that it had been raining all day. "A school teacher came over and helped me out of the ditch."

Mr. Pierce, testifying for the defendant, stated that he helped get Mr. Conner out of the ditch, but he could not remember the date, except that it had been raining, and that one of the school buses got into the ditch.

The foregoing is the substance of the testimony for the defendant.

Brooks Hervey was recalled in rebuttal and stated that about that time or shortly thereafter he made the trip to Oklahoma City with Mr. Ardrey. He went out in the neighborhood and tried to locate the defendant, B. C. Conner. The first time he went out was about the 20th of October, 1937, and did not find him.

"I inquired for him, but did not find him on the 21st when I was out there. When I was in the neighborhood, Mr. Estes told me and Mr. Waldrep that he did not know anything about any cattle. He said he was dead drunk. I often go to the country, looking for parties, and do not find them. On the 20th I was looking for Joe Estes. I did

not go to Buster's on the day I got Joe Estes. I sent Buster word. I told his wife that he could not get away—better come on in. I did not go to Conner's house the morning I went out for Joe Estes. Mrs. Conner said he was gone. She told me he had gone to El Reno."

B. C. Conner was recalled for further cross-examination and identified his signature on a note which was handed him.

B. B. Hickman was recalled and identified more of the signatures for the defendant and stated that he had compared them with the witness' signature on the waybill and in his opinion the same party who wrote the signature on the waybill wrote the signature on the other exhibits.

The defendant has assigned 5 errors which he alleges the court committed in the trial of his case, and which he deems sufficient to warrant this court in reversing the same.

(1) Said court erred in overruling the motion of the plaintiff in error for a new trial.

(2) Said court erred in overruling the demurrer of the plaintiff in error to the state's evidence when the state rested its case.

(3) The court erred in admitting evidence on the part of the defendant in error over objections of the plaintiff in error.

(4) Said court erred in refusing and ruling out competent and legal evidence offered by the plaintiff in error.

(5) Said court erred in overruling and denying plaintiff in error's motion and application for a continuance.

The defendant next urges and insists that the trial court should have sustained his motion for a continuance for the reason set forth in the motion. The record shows that the witness for which a motion for continuance was made was in the city of Duncan the day prior to the trial, and after a subpoena had been served on him and he had a

conversation with the sheriff as to whether or not he should go on to Texas or attend the trial. There was no showing of sufficient diligence to warrant the court in continuing the case.

The defendant also complains of the action of the court in forcing him to trial after his attorney that had been representing him for sometime withdrew from the case the day before the case was assigned for trial, and that he did not secure counsel to defend him until the morning of the day the case was set.

Trial courts should be careful to see that the defendant is accorded all rights preparatory to his trial, and where it is shown that his counsel that had been representing him withdrew from the case, requiring the defendant to procure other counsel. In all fairness it would seem that the court in the exercise of its sound discretion, if he does not continue the case for the term, should give the defendant and his counsel a few days' time to properly prepare for trial. It is passing strange that reputable counsel will withdraw from the case the day before the case is set for trial. If there is any professional or legal reason why counsel should withdraw from the case of the defendant he had been representing for sometime, counsel should notify the defendant a sufficient length of time before the day the case is set for trial that he intends to withdraw, and advise him to make preparations to have counsel ready on the day of the trial to defend him, and not wait until the day before the case is called for trial.

The defendant in his argument discusses two of the assignments in his petition in error.

First, the defendant complains of paragraph 11 of the court's instructions which is as follows:

"You must consider these instructions in their entirety, you have no right to consider any part or portion of these instructions to the exclusion of any other part or portion thereof."

The defendant relies on Hobbs v. State, 9 Okla. Cr. 598, 132 P. 822, to sustain his position that the instruction deprives the defendant of a fair and impartial trial, and that the instruction was misleading to the jury.

The instruction given by the court which the defendant complains of is not in the exact language of the instructions given by the court in Hobbs v. State, supra. In the Hobbs case the court told the jury: "You are to consider these instructions as a whole, and not be bound by any particular instruction or part of an instruction."

In this case the court's instruction does not limit the jury, and, as we interpret the instruction, it does not eliminate the question of reasonable doubt, and does not deprive the defendant of any of his constitutional rights. The instruction complained of is the usual instruction given by the trial court, directing the jury that in the consideration of its verdict, it must consider all the instructions together and not single out any part or portion of any instruction to the exclusion of any other part or portion of an instruction. The court did not err in giving the instruction complained of.

There is nothing in the record to show that the trial court abused its discretion in refusing to grant time for the new counsel defending, to prepare the case for trial. It is difficult for counsel, who has not gone over the testimony of the witnesses in the case, to immediately go to trial, and properly defend. From examination of the record this court cannot say the trial court abused its discretion, but we feel constrained to say that members of the bar of this state, when they have been employed in a case to defend, if they expect to and are going to withdraw from the case, they should notify the party charged a sufficient length of time to secure other counsel and prepare for trial.

The next and only question to be considered by this court is the question of the sufficiency of the evidence. The state relies on circumstantial and expert evidence. The prosecuting witness J. W. Ardrey was the owner of a male

calf of the bovine species. The defendant in this case lived in the same neighborhood, near the prosecuting witness. On or about the night of the 12th of October, 1937, this bull yearling disappeared from the neighborhood where it had been raised. The prosecuting witness missed the bull, and began looking for him, but could not find him in the neighborhood. Later on he came to Oklahoma City, and went to the packing plant, and found where a bull, on the 13th of October, 1937, had been brought to the stockyards by a party who, when he signed the waybill, signed B. C. Conner, the same initials and name as the defendant in this case. This party directed the man in charge at the time he brought the bull in, to consign the bull to Jake Simms who was engaged in the commission business, buying and selling stock, at the stockyards. The prosecuting witness, together with the sheriff of the county and his son, learned to whom the bull had been sold, and went to the party that had bought it, and from him learned that the hide had been sold to a hide house here in the city of Oklahoma City. The manager of the hide house had several hundred hides packed down preparatory to curing, and had his force lift the hides out one by one, and after something like 400 hides had been moved, they came to a hide the prosecuting witness identified as in his judgment being the hide from his bull. The · brand was also testified to.

In the trial of the case a witness by the name of B. B. Hickman was called and qualified as an expert on questioned documents. He examined the waybill on which had been signed at the packing plant the name of B. C. Conner. He also examined the signature on a chattel mortgage, a promissory note, and some other documents that the defendant admitted that he had signed. Hickman testified that he had compared the signature on the waybill, and the signatures that the defendant admits he had signed, and in his judgment the same man that signed the promissory note, the chattel mortgage, and the other papers, signed "B. C. Conner" to the waybill.

The testimony on behalf of the defendant admits that the defendant lived in the neighborhood where the prosecuting witness lived, and that he knew the prosecuting witness had a bull. The evidence shows that the bull had a letter "Y" run on his side, and a white face and had a white spot on the back of his neck. The defendant denied that he took the bull of the prosecuting witness, that he knew nothing about it, and did not sell it to the packing plant in Oklahoma City. Defendant denies that he had been to Oklahoma City for several weeks prior and after the date that it is alleged the bull was stolen. He called witnesses, one of whom testified that he lived a short distance from the defendant, and that his pick-up was on the north side of the defendant's house both morning and evening for several days after the 9th of October, 1937, the day that defendant's father was buried.

Several other witnesses were called who testified that on the morning of the 13th they were at the defendant's house, and that he was at home.

In substance all the testimony of the defendant is in the nature of an alibi, and that defendant was at home and could not have been in Oklahoma City on the night of the 12th of October or the morning of the 13th of October, 1937.

The evidence of the state and the defendant is not in harmony. The circumstances and the comparison of the signatures if believed by the jury was sufficient to warrant the jury in returning a verdict of guilty against the defendant. The testimony of the defendant and the witnesses of the defendant if believed shows that the defendant was at another and different place than Oklahoma City on the night of October 12th and morning of the 13th of October, 1937, and could not have possibly been in Oklahoma City the time the evidence shows the bull was delivered to the yards of the packing plant.

The court's instructions were as fair to the defendant as the facts shown would justify, and as fair to the defendant as they were to the state.

The evidence is conflicting and under our statutes, section 3062, O. S. 1931, 22 Okla. St. Ann. § 834, in part reads as follows: "The questions of fact are to be decided by the jury."

In Adams v. State, 54 Okla. Cr. 363, 21 P. 2d 1075, in the first paragraph of the syllabus this court said:

"Conflicting issues of fact are for the sole determination of the jury. A conviction will not be disturbed on appeal because of conflicts in the evidence, if the evidence adduced reasonably tends to support the verdict and judgment." Wilson v. State, 32 Okla. Cr. 139, 240 P. 155; Underwood v. State, 36 Okla. Cr. 21, 251 P. 507; Humberd v. State, 56 Okla. Cr. 23, 32 P. 2d 954; Coats v. State, 56 Okla. Cr. 26, 32 P. 2d 955; Kisselburg v. State, 56 Okla. Cr. 46, 33 P. 2d 236; Kimbrough v. State, 66 Okla. Cr. 66, 89 P. 2d 982.

We hold that this court will not disturb the verdict of the jury under the authorities herein cited for insufficiency of evidence.

Other errors are assigned by the defendant, but not discussed in his brief. After a careful examination, we find they are without merit.

There is nothing in the record to show that the defendant had not led an upright, honest life, and had been a good citizen prior to the alleged crime for which he has been convicted. His neighbors all speak of him as being a reliable, working man.

Considering the facts in evidence, the conflict of the testimony, and the circumstantial evidence introduced against the defendant, and the evidence of his witnesses as to his being at home the night or the early morning of the alleged larceny, and remaining at home for several days

thereafter, it would seem that the punishment inflicted is excessive and should be modified, and that the ends of justice would be properly met by the modification of the sentence imposed on the defendant of 5 years to 2 years in the penitentiary, and as modified the judgment of the trial court is affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.