## ADDIE KIMBROUGH v. STATE.

No. A-9306. April 21, 1939.
(89 P. 2d 982.)

Eaton & Wheeler, of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DAVENPORT, J. The plaintiff in error was by information charged with the crime of murder, was convicted of manslaughter in the first degree, and sentenced to serve a term in the state penitentiary for 60 years. The record was properly preserved and from the judgment and sentence the defendant has appealed.

The testimony in substance in brief is as follows:

Columbus Reed stated:

"I live eleven miles east of Okmulgee. I knew Alex Rolland in his lifetime. He was my brother-in-law. I know Addie Kimbrough. Have known him since 1924. I attended a picnic in July, 1936, south of Eram. Henry Brazor was conducting the picnic. We drove my truck and my brother-in-law, and wife, and Otto Whitaker, and John

Phillips, accompanied me. There wasn't very many people on the picnic ground when we got there. It was 11:00 or 11:30 at night. After we had been there awhile, Addie Kimbrough, the defendant, came up to me and asked me to take my brother-in-law's gun, and I told him I would; he was going out towards the road at that time, and I followed him out in the direction of my truck, I asked him what the racket was about and he said, 'Son Taylor is trying to run over me,' that Son Taylor had slapped his wife and that he was going to kill him. Alex Rolland, my brother-in-law, started towards Son Taylor with a revolver in his hand, I grabbed him; I do not know what make of pistol he had. After I grabbed him and scuffled with him, he carried me pretty near back to the stand and I twisted the gun out of his hand, and stuck it back in my left hand and said, 'Some of you men take the gun.' George Brazor took the gun and told me he threw it back over across the barbecue pit by a big tree. When I seen him again he was coming up to me and I held Alex by the hand, held his shoulder and I said 'Come on, let's go,' and he said, 'All right, I am ready.' We started to go back to the truck. About that time I heard my sister say, 'Don't shoot.' We started to the truck to go home. Addie walked up and said, 'I told you to be quiet,' and sticks the gun right across my arm, just like this, and shot him there the first time. Not a word was said between Alex Rolland and Addie. Alex was not armed at that time. Nor was he making any effort to shoot or hurt anyone. When Addie Kimbrough shot, Rolland fell back. Addie walked up and shot him twice more after he fell on the ground. The first time Addie shot Rolland, he stuck the gun right up in his face. Alex Rolland never said a word to Addie. After the first shot there was a little lapse of time before the next two shots took place. After Rolland was shot the only thing he said was, 'Bring me a drink of water.'"

This was in Okmulgee county, Okla.

On cross-examination the witness restated that he was a brother-in-law of the deceased; that Rolland had been drinking a little bit, but he was not drunk. "He went to the picnic with me. Kimbrough asked me to take deceased's gun. The deceased shot at Son Taylor. After Kimbrough asked me to disarm my brother-in-law, I took him out

towards the truck. We stopped at the gate. He shot at Taylor after we had stopped at the gate."

He was up near the barbecue stand and saw Taylor slap his wife.

"I saw Taylor slap Rolland's wife. We were standing at the gate when we saw him slap the woman. I couldn't prevent him from shooting at Taylor. I caught him around the arm but could not stop him. Taylor was running when Rolland shot twice at him. Rolland did not shoot at Kimbrough. I took the gun away from him after he had shot at Son Taylor. The reason I did not throw his arm up was that I was afraid I would get shot. The gun my brother-in-law had is a .22 caliber. I employed Mr. Payne to assist the prosecution in this case. Rolland was not doing anything at the time the defendant shot him. He did not say anything; neither did the defendant say anything to him. The defendant walked up and asked deceased, 'Didn't I tell you to keep quiet.' I had hold of the deceased when the defendant shot him. I was holding him and trying to find out what started the argument between he and Son Taylor. The wife tried to get Alex to go back and let Son Taylor alone. Henry Brazor, my brother-in-law George, and I were on good terms. Sadie Brazor was in the stand at the time of the shooting. The only guns I saw that evening was the one I took away from my brother-in-law, Alex Rolland, and the one Addie Kimbrough had. The Kimbrough gun made the loudest noise. As near as I can get it, I took the gun off Alex about fifteen or twenty minutes before Addie Kimbrough came up. I didn't tell Addie that I had taken the gun off him."

Grace Rolland, Harmon Nonnette, Otto Whitaker, and George Brazor, as witnesses for the state, testified in substance the same as Columbus Reed, all stating that prior to the shooting of the deceased, deceased had some trouble with Son Taylor and that the deceased discharged his pistol twice at Son Taylor, that Columbus Reed got hold of the deceased and was holding him, and the defendant came up and then went away for a few minutes and returned where Reed still had hold of the deceased and walked up close to them and fired at the deceased. They all stated that the deceased fell at the first shot, and that defendant then fired two more

shots into the body of the deceased while he was laying on the ground.

Erie Upton, the sheriff of Okmulgee county, stated in substance:

"I was called out to the neighborhood south of Eram around 3:00 o'clock in the morning. I met Addie Kimbrough the defendant. Kimbrough had called me and told me he had had some trouble and had killed a fellow and wanted me to come out for him. I learned it was Alex Rolland that Kimbrough had killed there. The gun he turned over shot a 32-20 Winchester shell. I believe it was a Spanish make. It was not an American gun. I have the shells, both loaded and empty, that were in the gun at that time. There were three loaded and three empty shells. I don't believe I examined the gun to see if it had been recently fired; however, I threw the cylinder out to see how many shells had been fired and to see if there were any loaded shells in the cylinder."

The gun was introduced in evidence without objection on the part of the defendant.

On cross-examination the witness stated that the defendant advised him where he would be, and that he drove out to the place designated and met the defendant.

"I asked him what happened and he told me something about it. I went out to the scene of the killing and made some investigation. I brought the defendant in to jail, and it was getting daylight. Jim Mason and I went back together. When I got out to the picnic grounds, I saw a nigger by the name of Reed and one by the name of Joe Sango. There were several there, but I did not know any of them by name. I did not know the Brazor boys. I talked to Columbus Reed about 6:30, maybe 7:00 o'clock in the morning. I have known the defendant four or five years."

Fentrice Brook testified on behalf of the state, and stated:

"My name is Fentrice Brook. I live four miles east of Morris. I knew Alex Rolland during his lifetime. I know Addie Kimbrough. I attended the picnic on the 19th of July, 1936, south of Eram. It was after dark when I got

to the picnic grounds. It was practically daylight next morning when I left. Son Taylor and Alex Rolland got into trouble first. I don't know what it was about. I heard two shots fired. Alex Rolland fired the first two. That was at the time he and Son Taylor was having their trouble. I know Columbus Reed. He was present. He had hold of Alex Rolland at the time he fired the two shots. I didn't see the pistol. I don't know how long Columbus Reed held Alex Rolland. Reed carried Alex around towards the gate. It was a good ways from Columbus's truck. It wasn't long after the first shooting until there were other shots fired— I would say something like five minutes. I saw Addie Kimbrough when the last shots were fired. Addie Kimbrough did the last shooting. I didn't hear anything said. At the time the defendant Kimbrough began shooting he and Alex Rolland wasn't very far apart. They were close together. I didn't hear either one of them say anything. There were three shots fired at the last shooting by Addie Kimbrough. The last three shots fired by Addie Kimbrough was louder than the two fired by Rolland at Son Taylor. When Kimbrough fired, Rolland fell backwards and I don't know whether he fell on his face or his back. Rolland fell when the first shot was fired by Kimbrough. After Kimbrough fired the last shot he turned and left. There was one shot fired and then the two right behind each other."

On cross-examination the witness stated that there were five shots fired that evening. He did not count them but he knew there were five:

"I didn't see the deceased Rolland and Kimbrough either have a gun; but I heard the shots, and I know who fired them. Addie fired the last shots." He said, "I saw Addie shoot. He was shooting with a gun. I didn't see the gun. I saw Francis Myers yesterday, here at the court house, and talked to him but not about this case. I did not tell Myers that when this shooting was going on that I saw Alex Rolland with a gun. I was not talking with any one about the guns."

On re-direct examination the witness stated the last three shots were the same sound.

Grace Rolland was recalled on behalf of the state, and stated that Alex Rolland was dead.

"He died about 20 minutes after he was shot up there at the picnic ground. He was buried in the North-West Cemetery. I attended the funeral. He was shot three times, in his breast once, in his stomach once, and in his chin. I know Alex Rolland died from the effects of the gunshot wound."

On re-direct examination the witness stated that Rolland was 25 years of age and in good health at the time of the trouble.

The foregoing is the substance of the evidence introduced by the state.

Arthur Claire, called in behalf of the defendant, stated:

"My name is Arthur Claire. I live south of Eram. I have lived in this country 30 years. I am a farmer. I know where Addie Kimbrough lived on July 19, 1936. And, also, know where there was a picnic going on at that time. I was down to the picnic grounds a little while that evening. I went down about 9 o'clock and left about 10. I saw the defendant Kimbrough and Alex Rolland there. There was no difficulty whatever occurred while I was down at the picnic grounds. I live about 70 rods from where the picnic was held. About 3 o'clock in the morning I heard some shooting. The first three shots I heard—two of them were right together, it seems they waited just a little bit and then the other. There was just a second between the first ones and just a little while and then I heard three more shots. I heard six shots. The first three shots were louder than the last three. I did not see a gun on either Alex Rolland or Addie Kimbrough while I was at the picnic grounds. I had gone to bed and some people came down to the well to get some water and woke me up and later I heard the shooting. I am positive that I heard three shots the first time and then three more. I looked at the body on the truck next morning and I saw three holes in the body. The largest gun would make the loudest report. I was down there later and stepped some distances from different points designated by the parties who were present that night. I didn't put the figures down. The section line is north of the stand and must be about 18 steps. This picnic ground is on the same side of the road as my house. The place where they showed me the shooting occurred was towards the gate from the stand. It was closer to the gate than to the stand."

Joe Sango testified for the defendant and stated:

"My name is Joe Sango. I live 16 miles east of here, south of Eram. I am a farmer. I know Addie Kimbrough; have known him about seven years. I did not know Alex Rolland in his lifetime. I had only seen him once. There were six shots fired there all together. Alex fired three shots the first time. He was shooting at Fred Taylor. Fred Taylor was running when Alex was firing the shots. Alex walked around the stands and started back on the north side and Kimbrough walked around on the north side coming east to talk to Alex and said, 'If you don't cut this fuss out you might kill somebody.' Alex turned back and said, 'I will kill you, you black s— of a b—.' There were three shots fired. The same gun made the first shots." "Did you see the last or hear the reports?" "I heard the reports. The two last shots were loudest. Kimbrough's gun, I guess. The last two shots were loudest. After the shooting Kimbrough walked off. Alex fell right down backwards. I know Columbus Reed. I did not see him at the time. I was about ten steps from where the shooting occurred—back off east. The shooting took place between the stand and the gate, closer to the gate than to the stand."

On cross-examination the witness stated that he had been at the picnic grounds about all night, that the shooting occurred about 2 or 3 o'clock in the morning. "When he fired the first three shots he was standing there by the stand. I didn't see who shot the first shots. No, I reckon Alex was shooting the first three. The party that fired the first three shots was Alex Rolland. Rolland was pretty full at the time. I was not drinking. I had had a drink or two. Kimbrough did not seem to have been drinking. The shooting took place between 2 and 3 in the morning. I stayed at the picnic grounds until daylight, after the officers came. Kimbrough was not there at that time. I don't know who fired the last three shots. I know Kimbrough fired the last two. I saw him with the gun up. I was about ten steps away from them. I don't know whether Kimbrough went and got his gun or not. When the first three shots were fired, Kimbrough talked to Alex Rolland and said somebody would have to take him home. After that Kimbrough walked

up to Rolland. I heard what he said to him. That was after the first three shots. The first three shots were fired at Taylor. Kimbrough walked up to Rolland and talked to him a good while, then the gun commenced to fire out there. The small gun fired first it sounded like; then the gun that sounded loudest fired the last times. I saw Kimbrough shooting. Kimbrough left after the shooting."

Addie Brazor testifying for the defendant stated she was the wife of Henry Brazor; that she was at the picnic on the night of the killing; that she did not know who did the shooting; nor did she count the shots. It seemed to her that there were five or six shots in all; did not know whether the shots were different in sound as she paid no attention to it. The first shooting was near the stand in which she was working; that the defendant came to her house after the shooting; that she is a sister of Harmon Nonnette; that her brother Nonnette came to her home and remained there quite awhile and her husband Brazor and the defendant Kimbrough went to the home of Mrs. Ganus to phone for the officers; that she heard no statement by the defendant to the effect that he intended to kill the deceased and if there was any one there who did not like it he would give them some of the same dope; that it was not made in her presence, and that she did not get between her brother Nonnette and defendant.

Son (or Fred) Taylor testified for the defendant and stated: "On July 19, 1936, I attended the picnic"; that the deceased Alex Rolland shot three times at him. "I was standing close to the gate, between the stand and the gate."

On cross-examination witness stated:

"In my judgment Rolland was drunk. I had no difficulty further than that he walked up to me and started talking. I pushed his wife; she walked up in my face and called me a God-damned black s— of a b—, and I pushed her. When I pushed her back out of my face is when he went to shooting at me. I don't know whether his wife was drunk or not. I have known Rolland two years. When

Rolland was standing near me Columbus Reed was not by his side; nor was he standing beside him when Rolland started firing. Columbus Reed was not standing there when Rolland began shooting at me. Rolland had a big gun; it sounded like a big gun to me. I did not hear the other shots."

Simon Myers testifying on behalf of the defendant stated that he was at the picnic; the shooting took place about 3:30 in the morning; there were two sets of shots fired that night. Alex Rolland fired the first three shots; and later on there were three shots fired. When defendant Kimbrough came up where Alex was and was trying to talk about shooting among the crowd, he told him he might shoot some innocent person. Alex cursed and said he would shoot him. "At that time the people rushed back against me and about that time the shot was made. I did not see this made, the first shot there, but Addie made the second two. The first shot did not seem to be from the same gun. It did not seem to be as loud as the last two. I was not in a position to see the guns."

Bud Walker and Jim Taylor were called as witnesses and testified in substance to the same facts as the other witnesses for the defendant.

J. W. Anderson and Omlsted Mays testified as to the condition of the defendant's gun at the time he started to the picnic with it.

The defendant Addie Kimbrough testifying in his own behalf states as follows:

"I am 25 or 30 years of age; I became acquainted with the deceased, Alex Rolland, within the last year previous to the killing; I was running the picnic on the night of the killing; I had the place rented for the year 1936 from C. C. Jennings."

Defendant stated about the Alex Rolland and Fred Taylor affair:

"I don't know anything except that I was standing west when the gun was fired through the crowd at Fred (or

Son) Taylor; then a few minutes after that I was going on that side of the crowd and trying to get over there and get Alex Rolland, just about—I presume, nine steps from the stand and I says, 'Alex put your gun up and go home.' He said, 'You God-damned s— of a b—, I will kill you,' and then he fired and when he fired the first shot, I shot him. I had to get my gun. I had to pull my gun, and I shot him there and there (indicating)."

The defendant denied he made any statement to Brazor or in the presence of Nonnette that he had killed Rolland and if any of them wanted trouble, or words to that effect, they could get it. The defendant was questioned with reference to killing his wife and his counsel objected to that. The court overruled the objection and he saved his exception.

"Q. Go ahead and answer. A. That was in 1916. Q. And when were you tried? A. My trial was in 1916. Q. When did you go to the penitentiary? Mr. Eaton, counsel for the defendant: We object to that as incompetent, irrelevant, and immaterial. The court overruled the objection. Mr. Eaton: Exception. A. I went in 1916. Q. And how long did you stay in the penitentiary? A. How long did I stay in the penitentiary? I stayed * * * Mr. Eaton: We object to that as incompetent, irrelevant and immaterial. The court: Overruled. Mr. Eaton: Exception. A. I stayed about three years. Q. Who represented you at that time? Mr. Eaton: We object to that as incompetent, irrelevant and immaterial. The court: Sustained. Q. How did you get out of the penitentiary? Mr. Eaton: We object to that as incompetent, irrelevant and immaterial. The court: Sustained. The court: Is that all? Mr. Eaton: I don't think of anything else. No, I believe I will ask him this: Q. State whether or not you were pardoned?"

Mr. Payne objected to that as incompetent, irrelevant, and immaterial.

"The court: I am going to let him answer. A. Yes, I was given a pardon. Q. And that was after you were committed to the penitentiary and served three years, you were pardoned? A. Yes. Mr. Eaton: That is all."

Cross-examination by James K. Eaton:

"Q. What year were you pardoned in? A. I believe it was 1923. Q. You were out on parole for a long time? A. Do you want me to explain? Q. No, answer the question. You were out on parole? A. I was out on parole for good behavior and after my parole any Governor coming in the office and looking at my record would have given me a pardon and restored my citizenship."

Mr. Eaton objected to the question as being incompetent, irrelevant, and immaterial.

"The court: Sustained. The court: What governor pardoned you? A. I was pardoned under Governor J. C. Walton."

Judge J. E. Gilder, Carlisle Mabry, John Milner, and W. B. Edwards, reputable citizens of Okmulgee county, testified to the good character of the defendant.

The record discloses that the defense made in this case, as shown by defendant's testimony, is self-defense; and the foregoing is in substance the testimony of the defense which shows a clear conflict in the testimony. The defendant in his petition in error has assigned 21 errors alleged to have been committed by the trial court, which errors he believes to be sufficient to warrant this court in giving him a new trial. The plaintiff in error in his brief discusses the thirteenth and fourteenth assignments, and in his argument he admits that the evidence tends to prove that the deceased was shot and killed by the defendant without provocation; he further admits that there is evidence tending to show that the act of the defendant in shooting and killing the deceased was a cold-blooded and murderous deed. He argues further that on the other hand the record abounds in evidence to hold that defendant was justified in shooting deceased, and shot and killed him in order to protect his own life. He further argues that the court committed error in permitting the county attorney to be unfair and that the cross-examination of the defendant by the county attorney was full of insinuations, and the questions asked defendant by the prosecution were full of insinuations and were in-

dulged in for the sole and only purpose of prejudicing the minds of the jury against the defendant, notwithstanding the fact the prosecution was bound to know that the defendant was in charge of the picnic and had a right to carry a gun from the sheriff.

The defendant complains that the court erred in permitting the county attorney to cross-examine the defendant and propound to him the following questions:

"Q. You married an Indian woman? A. Yes. Q. And she was very wealthy? A. Yes."

The defendant in his argument discusses at length and with a great deal of force that when the court propounded the defendant the question as to what governor pardoned him, his answer was received by the jury with humor and laughter, and the defendant insists that the propounding of the questions to the defendant as to his going to the penitentiary, remaining there for a number of years, being out on parole, and being pardoned, and what governor pardoned him, prejudiced the rights of the defendant before the jury. Defendant does not dispute the fact on cross-examination by Mr. James K. Eaton in testimony on his own behalf that the state had a right to ask him if he had heretofore been convicted of a crime, and that the defendant under the law would be compelled to answer and state whether or not he had been convicted. But defendant insists when he had answered that he had been convicted of a crime and what it was, the manner of punishment imposed, the privileges granted, and the parole extended, and finally a pardon, was improper, incompetent and greatly prejudicial to the rights of the defendant to the extent to deprive him of having a fair and impartial trial under the law given to the jury by the court and evidence introduced before the jury.

The defendant further complains that the court erred in permitting the county attorney in his cross-examination of J. E. Gilder, Carlisle Mabry, John Milner, and W. B.

Edwards to propound the same questions as to his former conviction that were propounded to the defendant on his cross-examination.

The question for this court to determine is the question, had the county attorney the right in his cross-examination of the defendant and the other witnesses to go into the question of the defendant's previous conviction after he had shown, and the defendant had admitted, that he had been previously convicted of murder, and would the fact that the court over the objection of the defendant permitted the county attorney to go into the question of the defendant's conviction, when and where, when he went to the penitentiary, and how long he remained there, and when he got out, and whether or not he was pardoned, and the court's question as to who pardoned him, be such an error as would bias and prejudice the rights of the defendant in the minds of the jurors, and would it do so and by reason thereof, would the jury return a verdict of guilty or fix a higher punishment than it ordinarily would have done, had the question not been gone into.

The defendant insists that it would deprive him of a fair and impartial trial, that the questions were asked solely and only for the purpose of biasing and prejudicing the jury against him, and that the jury would in all probability have returned a different verdict had not this evidence been permitted to go to it. The defendant cites many cases of this court which he relies upon to sustain his position.

In Hicks v. United States, 2 Okla. Cr. 626, 628, 103 P. 873, 874 in the body of the opinion, the court said:

"Unfairness, whether intentional or not, taints everything it touches, and will vitiate a verdict unless it clearly appears from the record that there was no rational conclusion at which the jury could have arrived favorable to the defendant, and it must be absolutely clear upon this question, to wipe this taint out."

The testimony in this case is in direct conflict. The witnesses for the state swore to one state of facts, and the witnesses for the defendant to a directly opposite state of facts. The state's witnesses, if their testimony is true, make out a case of willful murder; the defendant's witnesses, if their testimony is true, make a clear case of self-defense, as the eye-witnesses for the defendant testified that the deceased shot at the defendant once before the defendant drew his pistol.

The defendant further cites Rogers v. State, 8 Okla. Cr. 226, 127 P. 365, in which this court said:

"In the examination or cross-examination of witnesses, it is highly improper for attorneys to ask questions which suggest unfair inferences, either on one side or the other, and such conduct should not be permitted by the trial court.

"Every defendant in a criminal case is entitled to fair treatment on his trial, and a prosecuting attorney should not be permitted to ask questions which he knows to be illegal for the purpose of prejudicing the defendant, or to make remarks in the examination of a witness which contain unfair reflections upon the defendant. In the examination of witnesses, he should confine himself exclusively to developing legal evidence against the defendant, and should reserve his comments on the testimony for his argument to the jury; and it is the duty of trial courts to rigidly enforce this rule." Jelts v. State, 7 Okla. Cr. 733, 734, 123 P. 1130.

In Wisdom v. State, 18 Okla. Cr. 118, 193 P. 1003, in the syllabus the court said:

"Where the evidence is in irreconcilable conflict, and the case is a very close one on the facts, the record will be closely scrutinized. In such case improper cross-examination of the defendant, properly objected and excepted to, is held sufficient ground for reversal of conviction."

In Brummett v. State, 39 Okla. Cr. 284, 264 P. 224, in the first paragraph of the syllabus the court said:

"A defendant, testifying in his own behalf, stands upon the same footing as any other witness on cross-examination upon matters affecting his credibility."

In the second paragraph of the syllabus the court said:

"Where the county attorney subjected the defendant to a series of immaterial questions as to other offenses and questions tending to degrade and belittle him, the objection of the defendant to the questions of the county attorney should have been sustained, and the court erred in overruling defendant's objection."

In the third paragraph of the syllabus the court said:

"A conviction will be set aside where a county attorney persisted in asking improper and prejudicial questions on his cross-examination of the defendant, and the trial court should have sustained the objection of the defendant to the questions of the county attorney."

In Pickrell v. State, 5 Okla. Cr. 391, 116 P. 957, the court said, in part, in the body of the opinion, 5 Okla. Cr. at page 394, 116 P. at page 958:

"We believe the action of the prosecuting attorney, as shown by the record constitutes misconduct on his part, prejudicial to the substantial rights of the defendant. Such conduct was clearly calculated to prejudice the minds of the jury, and manifested a disposition to disregard the legal rights of the defendant, and should have been promptly condemned by sustaining the motion for a new trial."

This defendant insists that the conduct of the county attorney in his cross-examination of the defendant and his witnesses as to the defendant's former conviction and other questions pertaining to the former conviction prevented him from having a fair and impartial trial and that the testimony admitted over objections of the defendant caused the jury to be biased and prejudiced against him, and he insists that the examination went beyond the bounds of reason and clearly constitutes reversible error.

The state in its brief has made no effort to answer the question raised by the defendant, not even mentioning the fact that the defendant complains of the admission of the testimony herein, supra.

Why the state did not answer the defendant's argument on the question, this court does not know. It is the duty of the state in filing a brief to answer all questions raised by the defense which tend to show that the defendant did not have a fair and impartial trial.

It is unusual that the state utterly ignores the brief of the plaintiff or questions argued and briefed by the defendant. It may be that the state considered the questions raised did not possess merit sufficient to warrant the state in considering the defendant's brief. If it be true that the state felt that it should not answer these questions, it is unsatisfactory and wrong. The state should always discuss all questions raised. If it thought they were without merit, it would take but a few lines in their brief to say so, and it would be of great benefit and interest to the court in preparing an opinion.

We have carefully read the record in this case and the brief of the defendant on the question of the cross-examination of the defendant and his character witnesses as to a former conviction of the defendant, where he had been charged with murder, the time he served in the penitentiary, and the fact that he was pardoned, and we have reached the conclusion that under the facts stated in this case, the action of the court in permitting the cross-examination by the state of the defendant and his witnesses is not such an error as would warrant this court in reversing the case.

This court feels constrained to say that the cross-examination by the state was not necessary and may have to some extent influenced the jurors in arriving at their verdict, and possibly influenced them to the extent that they imposed a greater punishment on the defendant after they found him guilty than they would have done had not the court permitted the evidence brought out in the cross-examination of the defendant and his witnesses complained of to go to the jury.

The defendant complained that the county attorney in his closing argument to the jury committed reversible error. With this contention we cannot agree.

Nearly all the statements of the county attorney complained of by the defendant, when objections were interposed, were sustained by the court. The record is silent as to whether the defendant asked the court to advise the jury not to consider the argument of the county attorney complained of; but as the court sustained most of the objections of the defendant, we do not think the argument prejudiced the right of the defendant or prevented him from having a fair and impartial trial.

An examination of the record shows the instructions of the court correctly advised the jury as to the law applicable to the facts.

This case as shown by the record was brought on by a picnic for negroes, attended by both the deceased and the defendant, the defendant being in control of the picnic and supposed to look after and keep order during the nights of the picnic.

When the testimony is analyzed, there is a great conflict. The state's witnesses swearing to one state of facts, that after Son Taylor had left the crowd where the deceased shot at him, two or three times, the defendant in this case came up and reached across the arm of a witness named Reed, who was holding the deceased, and shot the deceased who fell back, and the defendant shot two more shots into his body while deceased was laying on the ground. The gun the defendant used was a larger caliber than the one the deceased had used in shooting at Son Taylor. Although the eyewitnesses differ in their statements, all the witnesses state that the last three shots fired, which were fired by the defendant, the gun made a louder report than the first shots that were fired by the deceased, when he was shooting at Son Taylor. A witness for the defendant, Mr. Claire, testified he lived near the scene of the trouble

and sometime in the early morning after he had left the picnic grounds, he was awakened by parties coming to the well to get water, and later he heard six shots. He testifies that the first three shots made a louder report than the last three, contradicting the state's witnesses upon that question.

Other colored people who were at the scene of the shooting testified for the defendant and claim that when the defendant came up to where the deceased was and cautioned him to behave himself, the deceased called the defendant a vile name and told him he would kill him and fired one shot at the defendant before the defendant drew his pistol.

The jury by its verdict, finding the defendant guilty and assessing his punishment at 60 years, seem to have believed the witnesses of the state and disbelieved the witnesses for the defense.

No human mind can harmonize the conflict in this testimony; and it is seldom that a record discloses as great a conflict as is disclosed by this record.

This court has passed upon the sufficiency of the evidence so often that it seems useless to cite authorities. Beginning with the early opinions and coming on down to the present time, it has repeatedly held that where the evidence and the reasonable and logical inferences and deductions to be drawn from it are sufficient to convince the jury beyond a reasonable doubt of the guilt of the defendant, this court will not disturb the conviction for insuffciency.

Section 3062, O. S. 1931, 22 Okla. St. Ann. § 834, in part reads as follows:

"The questions of fact are to be decided by the jury."

In Adams v. State, 54 Okla. Cr. 363, 21 P. 2d 1075, in the first paragraph of the syllabus this court said:

"Conflicting issues of fact are for the sole determination of the jury. A conviction will not be disturbed on appeal because of conflicts in the evidence, if the evidence adduced

reasonably tends to support the verdict and judgment." Pickett v. State, 35 Okla. Cr. 60, 248 P. 352; Underwood v. State, 36 Okla. Cr. 21, 251 P. 507, 508; Campbell v. State, 23 Okla. Cr. 250, 251, 214 P. 738; Choate v. State, 37 Okla. Cr. 314, 258 P. 360; Mayse v. State, 38 Okla. Cr. 144, 259 P. 277; Humberd v. State, 56 Okla. Cr. 23, 32 P. 2d 954; Coats v. State, 56 Okla. Cr. 26, 32 P. 2d 955; Bond v. State, 53 Okla. Cr. 224, 11 P. 2d 200; Kisselburg v. State, 56 Okla. Cr. 46, 33 P. 2d 236.

Without citing further decisions of this court, we hold that this court will not disturb the verdict of the jury on the ground that the evidence is insufficient to sustain it.

There are many other errors assigned by the defendant; but upon careful study and consideration, they are without merit.

In view of the conflict in the testimony and the manner in which the witnesses testified, and in view of the further fact of the cross-examination of the defendant and his witnesses and the argument complained of by the defendant of the county attorney we believe the punishment inflicted upon this defendant is excessive and should be modified; that the punishment of 60 years in the penitentiary of the defendant in this case should be modified from 60 years to 20 years in the penitentiary, and as modified the judgment is affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.