MACK PRITCHETT v. STATE.

No. A-10356.   Jan. 24, 1945.

(155 P. 2d 551.)

402

Dennis Bushyhead, of Claremore, Frank Leslie, of Tulsa, and W. Lee Johnson, of Pawnee, for plaintiff in error.

Randell S. Cobb, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., and Dixie Gilmer, Co. Atty., of Tulsa, for defendant in error.

BAREFOOT, P. J. Defendant, Mack Pritchett, was charged in the district court of Tulsa county with the crime of murder, was granted a change of venue to Pawnee county, where he was tried, convicted of manslaughter in the first degree, and sentenced to serve a term of ten years in the State Penitentiary. From this judgment and sentence he has appealed.

All assignments of error may be considered together. This necessitates a review of the evidence.

The charge in this case was the outgrowth of the death of Donald Roland Lloyd, age 18 years. The de-

ceased and Sam Bellmard, age 16 years, were residents of the city of Tulsa. On January 24, 1942, about 10 o'clock in the morning, they left their respective homes for the purpose of going to the country. They both carried 22 rifles. They went into a field which adjoined the home of defendant, located at the edge of the city of Tulsa. Situated in the field, in a "draw" in close proximity to the Pritchett home, was an old abandoned automobile top. These boys were seen taking something from the automobile top, which later proved to be five pints of whisky. They also took a pint of gin from a gunny sack, which they found in the field nearby. The wife of defendant went out and frightened the boys away, but seeing they had guns, she did not speak to them. About noon her son, Lee Glenn (step-son of defendant), came home, and being told by his mother of the presence of the boys, he went in his car until he found them in a nearby field, and demanded that they return the liquor they had stolen. They went to a haystack where they had hidden the liquor, and gave him the one pint of gin, but not the whisky, which they left hidden in the haystack. Glenn had a 22 rifle with him.

The two boys then decided to go fishing in Mingo creek, which was near by. Late in the evening, they returned to the hay stack to get the whisky and found that it had been taken away. They then decided to steal some more, but to wait until it got dark so that they would not be detected. They finally left the haystack and crawled out toward the Pritchett home, but heard the dogs begin to bark, and laid down on the ground to wait until it got darker.

The defendant was a professional bird dog trainer, and had a number of fine bird dogs in his pens near his

home. He also raised game chickens, and other chickens which he and his wife sold to the market.

According to the testimony of Sam Bellmard, after the boys had waited on the ground for a short while, they heard a screen door slam, and then saw a form pass in the light of a window of the Pritchett home, and immediately afterwards two shots were fired. Another shot was fired, and later several more. He testified that he and Lloyd were talking, but after the third shot was fired, Lloyd did not answer when he spoke to him. That on examination he found that Lloyd's head was bleeding, and he attempted to pick him up, but could not, on account of his weight. He then "hollered—I hollered as loud as I could. I hollered, 'You shot a boy out here and please quit shooting.' " He testified that he "laid there quite a while," and then got up and ran to the Mack Pritchett home, and advised Mrs. Pritchett that a boy had been shot.

About this time Nellie Roberts and John Glenn, daughter and son of Mrs. Pritchett, returned from the grocery store, and upon being informed that someone had been shot, Nellie Roberts telephoned for an ambulance, secured a flashlight, and she and John Glenn went in search of the boy. They could not find him, and returned to the house, and Sam Bellmard, who was still in the Pritchett home, went with her and they found the deceased lying in the field, just 206 yards from the Pritchett home. Sam Bellmard testified that he told them that he had accidentally shot his companion. He went in the ambulance to the hospital in Tulsa, and young Lloyd died before reaching the hospital as the result of a shot in the head by a 22 rifle.

At the time Sam Bellmard came to the Mack Pritchett home after the shooting, the defendant testified that he

had gone into the chicken coops and dog kennels for the purpose of looking after the chickens and dogs. He returned to the house just at the time his step-daughter, Nellie Roberts, came into the house and reported that she could not find the body of the boy who had been shot. He started to go in search of the boy, but was called into the house by his wife, who was very nervous, and afraid to stay alone. He remained in the house until the body was found, and the ambulance left. Later he and his stepson, John Glenn, went to Shell creek, in Osage county, where a chicken pit was located, and where game chickens were fought. Later in the night, the defendant and his step-son; John Glenn, were arrested there, and placed in the Tulsa county jail. Defendant was charged with the murder of Donald Roland Lloyd.

It was disclosed by the evidence and admitted by the defendant that just before leaving for Shell creek, on the night of January 24th, John Glenn picked up the 22 rifle, which the defendant had shot and left on or near the concrete porch, and stated to defendant that he was going to dispose of the gun; and that when he and defendant started to get in the car to go to the chicken fight, about 20 minutes after the ambulance left, John said he was going to throw the gun away. That when they got to Mingo creek, John got out of the car, took the gun apart, and threw part of it on one side of the bridge, and part of it on the other side. This gun was later found by the officers and introduced in evidence, and defendant admitted it was the gun he picked up in his home and fired on the night of January 24, 1942.

The witness Sam Bellmard admitted on the witness stand that he and deceased had stolen the whisky as above stated, on January 24, 1942, and that they had on other occasions stolen other whisky from this place, which they

had sold in the city of Tulsa. He admitted that when he went to the Pritchett home after the shooting he told them he had accidentally shot the deceased. He also told the ambulance driver the same story, and told the officers of Tulsa county and the assistant county attorney that he accidentally shot him. It was not until later in the evening, in the office of the county attorney, when confronted by the assistant county attorney, who said, "This boy didn't shoot him," that he changed his statement and denied firing any shot. His explanation was that they had stolen the whisky and he thought that if he said he killed Donald Lloyd accidentally he would not be prosecuted for stealing the whisky. This is the evidence he gave at the trial of the case.

The two 22 rifles carried by the boys were found by the officers in the field near where the body of Donald Lloyd was found. They were both loaded and had loaded shells both in the magazines and in the barrels. A number of loaded shells were found by the officers on the ground, and although search was made, no empty shells were found.

Defendant, testifying in his own behalf, stated that he was 48 years of age; that he had married his wife, Mrs. Martha Glenn, when he was 46. That she had four children, three of whom, Nellie Roberts, John Glenn and Lee Glenn, testified in the case. That she owned the home where they were living at the time of this marriage, and Lee Glenn lived with them. That Nellie Roberts lived at a different address, and in the home where the Glenns had lived prior to his marriage with Mrs. Glenn. That his wife and her daughter, Nellie Roberts, had been engaged in the illegal sale of intoxicating liquor in the city of Tulsa prior to his marriage with Mrs. Glenn, and he knew of such illegal business. That his wife had been

convicted in the federal court at Fort Smith, Ark., and had served her sentence after they were married. That upon her release from prison, they had returned to their home, and she had not been engaged in the liquor business since that time. That he personally had never engaged in the illegal sale of liquor, but his step-daughter, Nellie Roberts, and her brother had brought whisky to his premises and concealed the same, and that he had known of this. That the whisky and gin stolen by the boys from the abandoned automobile on January 24, 1942, had been placed there by his step-daughter, Nellie Roberts, but he had no personal knowledge of its being there, and that he had not been informed by anyone that the boys had stolen the whisky until after the Lloyd boy was found shot.

He testified that he had been engaged in the business of training bird dogs for many years. That he trained them for field trials, and showed that this business was not only legitimate, but remunerative. He also raised chickens which he and his wife sold on the Tulsa market, and raised game chickens which he sold to those engaged in fighting them. On the morning of January 24, 1942, he was engaged in training a bird dog near Claremore, for the purpose of entering field trials in Texas. He returned home about 4 o'clock in the afternoon.

The time element as to when Donald Lloyd was shot, and as to whether it was dark, was one of the issues in this case. Two disinterested witnesses, R. L. Fesemeyer and L. B. Holt, testified that they were interested in bird dogs, and that the defendant was training and boarding three dogs belonging to Mr. Fesemeyer. That they left Tulsa on the evening of January 24, 1942, and arrived at the home of defendant about 6:30. That they stayed there about 45 minutes, and that it was between 7:15 and 7:30

when they left. They gave in detail their actions while there. Both testified that it was dark when they got there, and when they left, and·that it was necessary for them to turn on their headlights. Mr. Fesemeyer testified that he turned on the side lights of his car so that he could locate it when leaving.

Mrs. Martha Pritchett, the wife of defendant, Nellie Roberts, John Glenn, and the defendant all testified that it was dark at the time these parties left, and that it was dark at the time the shots were fired by the defendant. We have heretofore stated that the witness Sam Bellmard testified that they waited until about dark before moving from the haystack, and that they laid on the ground for 15 minutes before the shots were fired.

The officers testified that they measured the distance from the Pritchett house to where the body of the deceased was found, and it was 206 yards.

The defendant testified that when he heard the dogs barking and the chickens making a noise, he picked up a 22 rifle and stepped to the porch and fired it twice in a northwesterly direction. That he did not see or hear anyone at the time he fired, and that the shots were fired only for the purpose of frightening away any dog, or any one, causing the disturbance. He testified that chickens and other property had been stolen from him on different occasions prior to this time.

The witness Sam Bellmard testified that as he went to the house, and when he crossed the yard fence, he looked back and could see a light object which he thought was the body of Donald Lloyd. The evidence revealed that Bellmard was wearing a light blue shirt, and that Donald Lloyd, was wearing a light tan shirt. An almanac was introduced in evidence, which showed that the sun set at

5:25, and that the moon rose at 12:20, on January 24, 1942.

From the above evidence it is almost conclusive that it was dark at the time the shots were fired by the defendant, and is somewhat doubtful whether an object such as the deceased would have been visible to the eye at a distance of 206 yards at that time.

The court instructed the jury upon murder, manslaughter in the first degree, and manslaughter in the second degree:

"You are instructed that homicide is manslaughter in the first degree in the following cases:

"First: When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"Second: When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner or by means of a dangerous weapon, unless it is committed under circumstances as constitute justifiable homicide.

"Third: When perpetrated unnecessarily while either resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed." Tit. 21 O. S. 1941 § 711.

In addition to this instruction, the court gave the following:

"Instruction No. 13. You are instructed that any person who wilfully discharges any species of firearm, airgun, or other weapon, in any public place, or in any place where there is any person to be endangered thereby although no injury to any person shall ensue, is guilty of a misdemeanor.

"Instruction No. 14. You are instructed that if you believe and find from the evidence in this case beyond a

reasonable doubt that the defendant, Mack Pritchett, at and in the County of Tulsa, State of Oklahoma, on the date alleged in the information, unlawfully and wilfully shot off his 22 rifle, and you further believe and find from the evidence beyond a reasonable doubt, that the deceased, Donald Roland Lloyd, was killed by the discharge of said 22 rifle in the hands of the said defendant, Mack Pritchett, although without any intention or premeditated malice or design on the part of the said Mack Pritchett to shoot and kill the said Donald Roland Lloyd, and you further believe and find, beyond a reasonable doubt, that said act was wilfully and unlawfully done, in violation of the law making it a crime to shoot or discharge any species of firearm, airgun, or other weapon, in any public place, or in any place where there is any person to be endangered thereby, then and in that event you will find the defendant guilty of manslaughter in the first degree, and so say by your verdict; on the other hand if, after a careful and fair consideration of all the evidence in this case, you have a reasonable doubt of the guilt of the defendant, you will give him the benefit of such doubt and acquit him."

It is contended that the court erred in giving these instructions, for the reason that the evidence did not justify the giving of the same, it not having been shown that the defendant had committed a misdemeanor, as defined by the statute.

We have been unable to find a case from this court passing upon the identical question raised by counsel, and counsel failed to cite any.

The above statute seems to be divided into two parts: First, a "public place;" and, second, "any place where there is any person to be endangered thereby."

It may well be conceded by all that the evidence does not justify the finding that the gun in the instant case was fired in a "public place." The defendant lived in the country. He was on or near the porch of his own home.

The gun was fired into an open field. Certainly this was not a "public place." The phrase "in a place where there is any person to be endangered thereby" to our minds means that the party discharging the gun would have to either be possessed of some information, or have reasonable grounds to believe that some person was in the "place" where the firearm was discharged. If this were not true, any person who discharged a firearm, as described by the statute, where one was injured, would be guilty. The mere firing at a bird, or at an animal, if some one were injured, wounded or killed, would make one guilty, even though he be ever so innocent. There can be no question that the defendant in this case was convicted of manslaughter in the first degree by reason of the fact that the above instructions were given, and that under such instructions the jury came to the conclusion that the defendant was committing a misdemeanor at the time he fired the shot. We do not think the statute can be so construed, and the giving of the instructions was prejudicial to the defendant.

The case of Palmer v. State, 78 Okla. Cr. 220, 146 P. 2d 592, although not exactly similar, is somewhat like the case here under consideration. In that case the defendant and deceased were fighting, and the deceased was knocked or fell to the ground. His head struck the pavement, and as a result he died. The defendant was convicted of manslaughter in the first degree, and sentenced to four years in the penitentiary. That case was reversed for the failure of the court to properly instruct the jury upon the question of excusable homicide and the commission of a misdemeanor.

Here the court submitted an instruction giving the words of the statute as to excusable homicide, but also

gave an instruction upon the commission of a misdemeanor, which in our opinion was not justified by the evidence. In the instant case this instruction was duly excepted to by the defendant, and defendant's conviction of manslaughter in the first degree was, in our opinion, the result of this instruction.

We now consider the record with reference to manslaughter in the second degree. The jury, under the circumstances of this case, could have found the defendant guilty of culpable and criminal negligence in firing the shot which killed the deceased. It could have found that the defendant was guilty of culpable or criminal negligence in not firing the gun into the air, instead of straight ahead; or that he was guilty by reason of firing it at all, under the circumstances. Such a verdict under the manslaughter in the second degree statute could have been upheld, but under the facts here presented, a judgment and sentence of first-degree manslaughter by reason of the commission of a misdemeanor cannot be sustained.

A post mortem examination of the deceased was performed, and a piece of lead was taken from the brain. It was mashed, and weighed 21 grams, which was seven grams less than its original weight. The state did not offer any expert testimony, but the defendant offered a witness, Edward J. Mace, who was employed by the J. W. Megee Sporting Goods Company of Tulsa as a gunsmith, and who testified as to bullets fired from 22 rifles, both longs and shorts, and who testified that the shot taken from the brain of deceased could not have been fired from the gun owned and shot by the defendant.

This testimony, together with all the testimony in the case, was a question for the jury, and the judgment and sentence would not be set aside upon this evidence

alone. The question of whether defendant fired the shot that killed the deceased was a question of fact for the jury, from all the facts and circumstances in the case.

Defendant presents as error the refusal of the court to give requested instructions which presented to the jury the question of the right of the defendant to protect his property, and, under certain circumstances, the right to kill in defense thereof.

In the first place, the deceased was not upon the property of defendant, but in an open field adjacent thereto. No demonstration was being made by deceased toward the defendant, and the facts did not justify the court in presenting this issue to the jury. Collegenia v. State, 9 Okla. Cr. 425, 132 P. 375; Armstrong v. State, 11 Okla. Cr. 159, 143 P. 870; Marshall v. State, 11 Okla. Cr. 52, 142 P. 1046; Jackson v. State, 49 Okla. Cr. 337, 293 P. 567; Jones v. State, 59 Okla. Cr. 53, 56 P. 2d 423.

A reading of this record convinces one that this defendant was convicted of manslaughter in first degree upon the mistaken belief that this killing was brought about by defendant's commission of a misdemeanor at the time of the shooting. And also by the reputation of defendant's wife, her daughter Nellie Roberts, and sons John and Lee Glenn. The records of this court reveal that Nellie Roberts had been convicted upon numerous occasions for violation of the prohibition laws in Tulsa county, and her reputation as a violator of the prohibition laws was bad. The evidence revealed that she often hid and concealed intoxicating liquor on the premises of her mother, the wife of defendant, during the time she was operating a place of business in the city of Tulsa. The liquor stolen by deceased and his young companion on the date of the killing had been placed in the abandoned

automobile just a short time prior to the time it was stolen by the boys. It is further revealed that defendant's wife had been engaged in the sale of liquor prior to her marriage to defendant, and that she had been indicted in the federal court at Fort Smith, Ark., for conspiracy in connection with a violation of the liquor laws, and served her sentence in the federal prison after her marriage to defendant. The evidence reveals that defendant knew all of this at the time of his marriage, and with this knowledge his acts may not be condoned.

The defendant had been convicted in Tulsa county of the crime of unlawful possession of intoxicating liquor, and at the time of his trial in the instant case, that case was on appeal to this court. Since that time we reversed the case, for the reason that the officers making the raid did not have a search warrant, 78 Okla. Cr. 67, 143 P. 2d 622. By reading the record in this case, one can but be convinced that the liquor for which defendant was being prosecuted in that case and which was found hidden near the chicken house was the property of, and had been concealed there by his step-daughter, Nellie Roberts. Yet it might be observed that it was concealed on his premises with his knowledge and consent.

In his argument to the jury, and while that case was on appeal, the assistant county attorney referred to the matter of defendant's conviction. This, of course, was error, but alone probably not sufficient to reverse the case under the holdings of this court. His exact words were:

". . . and yet from the record in this case, twelve jurors in Tulsa county found him guilty of possession of intoxicating liquor. Mr. Johnson: Object to that statement as not borne out by the record and not true. The Court: I will have to state to the jury that the record does not bear that situation out, as you have made, Mr. Lassiter.

Mr. Lassiter: A conviction. The Court: You went further to say before a jury."

After a careful review of this record, we have come to the conclusion that this case should be reversed and remanded, and that unless the state has additional testimony which would justify the court in presenting the issues of murder, or manslaughter in the first degree, that the only issue to be submitted would be that of manslaughter in the second degree. We do not feel justified in modifying the judgment and sentence. The punishment for manslaughter in the second degree runs from a fine and jail sentence to a maximum of four years in the penitentiary. If the defendant is retried on that charge and should be found guilty, we think it best that a jury should decide the punishment to be given after hearing all the evidence presented. Of course, if the defendant is found not guilty, there will be no punishment.

For the reasons above stated, the judgment and sentence of the district court of Pawnee county is reversed, and the case remanded.

JONES, J., concurs. DOYLE, J., not participating.