# FRY v. STATE.

No. A-11112.   May 17, 1950.

(218 P. 2d 643.)

M. O. Counts, McAlester, and Clint Braden, Wilburton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, J.    Plaintiff in error, Leo Fry, defendant below, was charged by information in the district court

of Latimer county, Okla., with the crime of the murder of Lawrence Riley on March 23, 1947. The defendant was tried, and convicted by a jury of first degree manslaughter, which fixed his punishment at 25 years in the State Penitentiary, and judgment and sentence was entered accordingly. From said judgment and sentence, this appeal has been perfected.

Defendant makes numerous assignments of error which will be considered in the order of the propositions presented in his brief. It appears from the record that as. an afterthought the defendant Tommie Burke was charged jointly with the defendant Fry with the commission of the alleged crime. A severance was granted and Fry was tried separately and convicted and sentenced as hereinbefore indicated. On the trial there was a great deal of conflict in the evidence of the state and the defendant. These conflicts are the result of what may be termed a legal dilemma. The state was compelled to rely for its evidence in chief on the oral statements made by the defendant to Sheriff Bill Alexander of Pittsburg county, Sheriff R. D. Prock of Latimer county, Deputy Sheriff DeLoach of Latimer county, and others, as to the killing, the details of some of which the defendant denied. By charging Tommie Burke as a codefendant this impasse was created. This record certainly does not support a charge of murder against Tommie Burke. It presents him only . in the role of a bystander and not a participant. The state gained nothing by charging Burke. The procedure adopted was unnecessary since the defendant admitted the killing, and the stories related by the officers, as well as the defendant, as to the reason and the manner thereof in the main were substantially the same. The conflicts in the evidence appear as to incidental matters. A brief resume of the evidence discloses

the following uncontroverted and uncontradicted facts. It appears that the defendant Fry was 28 years of age, that he had lost a leg in an oil field accident some years prior to the crime herein involved, had an artificial leg, and at the time of the killing his home was in Hartshorne, Pittsburg county, Okla., though he had formerly lived in Latimer county. Before the killing on August 23, 1947, the defendant and decedent Lawrence Riley were friends. On Friday afternoon of August 22, 1947, the defendant and the deceased Lawrence Riley, together with the codefendant Tommie Burke and a Mrs. Whaley, met at a beer parlor in Hartshorne, Okla., around 5:30 p. m. There they engaged in beer drinking until about dark, or around 8:30, when they all loaded into Tommie Burke's truck, and went to a place designated as Antonelli's and run by a Mr. Pat Mahan, where they continued their drinking until around midnight when the proprietor moved them out and closed up. Mrs. Whaley was a relative of the defendant's brother's wife. During the round of drinking at Antonelli's the victim of the killing left with Mrs. Whaley and they were gone 20 or 30 minutes. They returned about 11:30 p. m. Shortly thereafter Mrs. Whaley left with some friends. Thereafter the defendant rebuked Riley for taking her out and admonished him "Lawrence, if I were you I would be careful with that woman. She has got some little children", to which Riley replied "Its none of your damned business. What you need is a good working over". The uncontradicted record shows that Fry challenged Riley to go outside. Defendant admits that he did so. A difficulty between them was prevented there only by the intervention of Mr. Mahan who told them he did not want them to have any trouble in his place. They obliged and resumed their beer drinking until he closed up. Some time during the drinking they were joined by Jody Critchard. About mid-

night Riley, Burke, Critchard and the defendant got into Burke's truck and drove to Gowen where Critchard got out. The record shows from the time of the difficulty at Antonelli's there were no further words between Fry and Riley. Leaving Gowen they proceeded down Highway 270 towards Hartshorne but in Latimer county. According to the statement given to the officers by the defendant shortly after his arrest, just east of the Pittsburg county line, Riley, who was then driving, drove the auto onto a sideroad about 30 or 40 feet and abruptly stopped, and according to the record became the aggressor, saying "Here is where something is going to happen". He got out of the truck and came around to Fry's side, Burke being in the middle of the seat. Burke said "Lawrence, there is no use of that". The defendant opened the door and said "Lawrence, there is no use of having any trouble". The defendant tried to push him back with his foot, and Riley grabbed and pulled him out of the truck. The defendant tried to get away, started around the truck but Riley jerked him back and turned him around and said "You son-of-a-bitch, this is where you get yours" and struck him on the left shoulder with some kind of heavy instrument. The record does not disclose what kind of instrument he used, nor does the record show that anything in the nature of such an instrument was found other than a wrench which belonged to the defendant and was in the defendant Fry's left hip pocket at the time the alleged assault was made upon him. Fry says the blow staggered him and the next think he knew they were on the ground. He said Riley was on top of him, choking and beating him. He said he could hardly breathe, that he was afraid that he would choke him to death. The defendant then got his pocketknife out and stabbed Riley in the left leg, he said, to get him off, as he feared for his life. The wound thus

inflicted resulted in severing the femoral artery and the saphenous vein so that Riley bled to death within a few minutes thereafter. Such is the evidence of the killing as delineated by the officers, as it was told to them by the defendant and as testified to by the defendant in his own behalf.

The conflicts in the evidence that appear in the record and which no doubt played an important part in the verdict were as follows: The defendant testified the reason he remonstrated about the deceased's attention to Mrs. Whaley was because the deceased had confided in him some time before that he had a venereal disease. He did not know how, when or where or who was present when this information was conveyed to him but that Burke heard it. Burke, of course, being a codefendant and having asked for a severance in the case did not testify. It appears that Riley did not tell the facts to the officers as to the reason he remonstrated with Riley, when they first interrogated him. Moreover the record shows a short time before the crime Riley had had a blood test and had given blood for transfusion for his father-in-law. The test did not disclose any trace of a venereal disease. No one else testified to Riley being so infected. In light of the test this cast a bad light upon the claim of Riley's being infected with a venereal disease. In fact, it gave it the appearance of being a defense figment of Fry's imagination. Riley's wife testified he never had a venereal disease. Another conflict which reflected on the defendant's character for truthfulness was the evidence when first interrogated by the officers he said a hitchhiker whose name was Bill killed Riley. Only after Burke told Officer Alexander that the story was not true did the defendant tell that he himself killed Riley. Furthermore, the defendant was uncertain in his delineation as to the

details of the fight. In addition, his recollection was hazy in relation as to how the truck was parked and just how the fight occurred, with reference to the truck lights, etc., also in which direction he was on the ground, east or west. Moreover, he was not certain but thought that Riley had his knee in his stomach. He testified the decedent beat him with some heavy object on the arms and head but was able to display only one bruise on his shoulder. Then, too, the only heavy object such as described by the defendant was the wrench heretofore mentioned which the defendant himself had in his hip pocket. If he had been beaten, as he claimed he was, there certainly would have been evidence of it about his arms and head. Furthermore, it was a day after the killing before he claimed the bruise on his shoulder was a result of the fight. The defendant and Riley were drunk, as the record reveals. The jury no doubt considered the killing the result of a drunken brawl, hence the inconsistencies in the facts, most of which were gleaned from a drunken recollection. The officers testified Fry said that he told them he threw the knife away. This he denied. Furthermore, he also denied that the knife found on the streets of Hartshorne in the vicinity of where they brought the dead body of Riley was his knife though he said it looked like his knife. He denied Deputy Sheriff Prock's evidence that when shown the knife he tried to scrape the dried blood off of it and was prevented only from doing so by the intervention of the sheriff. These and other inconsistencies incident to the killing appear in the record. From a factual standpoint the evidence presents issues falling within the provisions of Title 21, § 711, subd. 2 O.S.A. 1941, defining first degree manslaughter in part as follows:

"2. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual man-

ner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

The record is entirely lacking as to premeditation or intentional design to effect death, and therefore did not constitute murder. Tyner v. U. S., 2 Okla. Cr. 689, 103 P. 1057; Wingfield v. State, 81 Okla. Cr. 146, 160 P. 2d 945; Coslow v. State, 83 Okla. Cr. 378, 177 P. 2d 518; Hodges v. State, 65 Okla. Cr. 277, 85 P. 2d 443, modified 66 Okla. Cr. 422, 92 P. 2d 590.

Therefore, we are confronted with the question, Did the defendant act in his self-defense or resort to the use of more force than was necessary to resist the assault made by Riley upon him? This issue was one for the determination of the jury. Phelps v. State, 64 Okla. Cr. 240, 78 P. 2d 1068; Pritchett v. State, 79 Okla. Cr. 401, 155 P. 2d 551. The jury having determined this issue against the defendant, and there being competent evidence to sustain this verdict, the Criminal Court of Appeals will not interfere therewith even though there is a sharp conflict in the evidence and different inferences may be drawn therefrom, since it is the exclusive province of the jury to weigh the evidence and determine the facts. Sadler v. State, 84 Okla. Cr. 97, 179 P. 2d 479; Young v. State, 84 Okla. Cr. 71, 179 P. 2d 173; Kimbrough v. State, 66 Okla. Cr. 66, 89 P. 2d 982. The defendant's contention that the verdict of the jury is not supported by sufficient evidence may not be sustained.

Next, the defendant contends that the cross-examination to which the special prosecutor subjected him constituted prejudicial error. Such matters were inquired about as to whether the defendant had slept since the killing. Further, the defendant was asked and required to open and close the knife allegedly used in the kill-

ing time and time again and demonstrate its use notwithstanding the defendant frankly admitted he could not. demonstrate how he used it. The cross-examination was highly argumentative, with both prosecutors standing in front of the defendant engaging in the interrogation. Furthermore, the prosecutors resorted to repetition, and otherwise sought to leave unfair inferences in their cross-examination. In a close case such tactics may result in reversal. Wisdom v. State, 18 Okla. Cr. 118, 193 P. 1003. See, also, Rogers v. State, 8 Okla. Cr. 226, 127 P. 365, wherein this court said:

"In the examination or cross-examination of witnesses, it is highly improper for attorneys to ask questions which suggest unfair inferences, either on one side or the other, and such conduct should not be permitted by the trial court.

"Every defendant in a criminal case is entitled to fair treatment on his trial, and a prosecuting attorney should not be permitted to ask questions which he knows to be illegal for the purpose of prejudicing the defendant, or to make remarks in the examination of a witness which contain unfair reflections upon the defendant. In the examination of witnesses, he should confine himself exclusively to developing legal evidence against the defendant, and should reserve his comments on the testimony for his argument to the jury; and it is the duty of trial courts to rigidly enforce this rule." Jelts v. State, 7 Okla. Cr. 733, 734, 123 P. 1130.

However, in Brummett v. State, 39 Okla. Cr. 284, 264 P. 224, it was said:

"A defendant, testifying in his own behalf, stands upon the same footing as any other witness on cross-examination upon matters affecting his credibility.

"Where the county attorney subjected the defendant to a series of immaterial questions as to other offenses and questions tending to degrade and belittle him, the

objection of the defendant to the questions of the county attorney should have been sustained, and the court erred in overruling defendant's objection.

"A conviction will be set aside where a county attorney persisted in asking improper and prejudicial questions on his cross-examination of the defendant, and the trial court should have sustained the objection of the defendant to the questions of the county attorney."

See, also, Byars v. State, 56 Okla. Cr. 349, 39 P. 2d 157; Jackson v. State, 67 Okla. Cr. 422, 94 P. 2d 851. Much of the cross-examination was entirely unnecessary, and may have influenced the jury in fixing the punishment at a greater penalty after they found the defendant guilty. We do not believe, however, it influenced the conclusion by the jury as to the defendant's guilt. Nevertheless, it was the trial court's duty to see that the cross-examination was kept within proper limits. While the cross-examination was in many respects erroneous, we do not believe in the light of the whole record it was prejudicial except as to punishment.

Next, the defendant contends the trial court erred in overruling his application for a change of venue. The court based his action upon evidence adduced both by the state and the defendant. His findings, in overruling the application, are supported by the record in which he sets forth his reasons for overruling the application for change of venue. It reads as follows, to wit:

"Now I will have to find from the testimony, before I would be warranted in granting a change of venue in the case, that prejudice is such that the defendant could not have a fair and impartial trial. There are three affidavits attached to this application. They are all from Wilburton. Now, jurors are drawn from the county at large, and the County Judge's testimony was that there are eight townships in the county, and further all of the witnesses for the state and the defendant testified

here that they believe he can have a fair trial in this case. They all say that. So, before I would be warranted under the law that governs me the same as anyone else, before I would be warranted under the law in sustaining this motion, I would have to find that that condition existed. I would have to find that the prejudice of the people of Latimer County is such that the defendant can not have a fair and impartial trial. I can't find that from this testimony, gentlemen, I will be frank with you. The County Superintendent, who visits schools, I presume over the county, if there was a wide discussion of it she would hear something about it. And the County Judge who takes care of his duties as County Judge, contacting the citizens of Latimer County, says he thinks he can have a fair trial. The sheriff who was placed on the witness stand by the defendant and petitioner here, also testified that he thinks he can have a fair trial. I believe under that testimony—I don't believe Judge Tripp ever came out point-blank on the question as to whether or not he thought he could have a fair trial, or couldn't. He did discuss the proposition of some prejudice existing at the time the alleged offense happened."

The defendant contends that since nine of the 28 jurors called had fixed opinions as to the guilt or innocence of the defendant, this constituted strong evidence of prejudice. While indicative of prejudice, it certainly is not controlling since the record shows that the defendant only exercised six of his nine peremptory. challenges allowed by law. This evidence combined with the court's findings supported by the record does not lend great weight to this contention. Nor is the newspaper article offered in support of the application of great weight in view of the circulation being only 1,081 against a population of 12,380 in the county. Furthermore, the testimony of the county judge and the county superintendent offered by the state supports the court's conclusion as to a fair trial. As does the testimony of the

sheriff of Latimer county offered by the defendant. Under this state of the record we cannot say the trial court abused its discretion in denying a change of venue. On no other ground would we be justified in holding to the contrary. In Sweet v. State, 70 Okla. Cr. 443, 107 P. 2d 817, 820, this court said in sustaining the trial court in a similar situation:

"The presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense was committed; and if this is not true, the burden is upon the defendant who seeks a change of venue to establish his right thereto. Davis v. State, 53 Okla. Cr. 411, 12 P. 2d 555; Goss v. State, 24 Okla. Cr. 383, 218 P. 339; Maddox v. State, 12 Okla. Cr. 462, 158 P. 883.

"On motion for a change of venue, if upon the examination of the affidavits and counter-affidavits, and the examination of the witnesses in support of the application in open court, the court is convinced that a fair and impartial trial cannot be had in the county, then and under those conditions it is mandatory that he grant a change of venue, but not otherwise. He sits in judgment on that question just as any other question of fact that might be submitted to him, and unless it is clear that he has abused his discretion, or committed error in his judgment, his finding and judgment will not be disturbed by this court. Warren v. State, 24 Okla. Cr. 6, 215 P. 635; Wright v. State, 12 Okla. Cr. 443, 158 P. 290; Gentry v. State, 11 Okla. Cr. 355, 146 P. 719; Sayers v. State, 10 Okla. Cr. 233, 135 P. 1073; Edwards v. State, 9 Okla. Cr. 306, 131 P. 956, 44 L.R.A., N.S., 701; Watson v. State, 9 Okla. Cr. 1, 130 P. 816.

"By an abuse of discretion is meant a clearly erroneous conclusion and judgment; one that is clearly against the logic and effect of the facts presented in support of and against the application. Johnson v. State, 1 Okla. Cr. 321, 97 P. 1059, 18 Ann. Cas. 300; Black v. State, 3 Okla. Cr. 547, 107 P. 524; Turner v. State, 4 Okla. Cr.

164, 111 P. 988; Starr v. State, 5 Okla. Cr. 440, 115 P. 356; Tegeler v. State, 9 Okla. Cr. 138, 130 P. 1164.

"It is not an abuse of discretion to deny a change of venue where the subsequent proceedings show that there was no difficulty in securing a fair and impartial trial. Huffman v. State, 28 Okla. Cr. 296, 230 P. 272; Dodson v. State, 33 Okla. Cr. 85, 242 P. 578.

"The mere fact that the inhabitants of a county have read and heard of the commission of a crime does not disqualify them. To warrant a change of venue, it must be made to appear they have a fixed opinion as to the guilt or innocence of an accused to the extent that an accused cannot have a fair trial by an impartial jury. Johnson v. State, 35 Okla. Cr. 212, 249 P. 971; Newton v. State, 56 Okla. Cr. 391, 40 P. 2d 688."

See, also, Rawls v. State, 86 Okla. Cr. 119, 190 P. 2d 159. In the case at bar the evidence was as strong in opposition to the application as it was for it. Under these conditions, the trial court certainly did not abuse its discretion in overruling the application for a change of venue.

It is next contended that the trial court erred in allowing the jury to separate for the night. This separation was overnight during the adjournment of the trial. It was not after the case had been finally submitted to the jury for its consideration. Under the law of this state the matter of keeping the jury together before final submission of the issues to them is a matter within the discretion of the trial court, as provided in Title 22, § 853, O.S.A. 1941, which provides in part as follows:

"The jurors sworn to try an indictment or information, may, at any time before the submission of the cause to the jury, in the discretion of the court, be permitted to separate, or to be kept in charge of proper officers."

The foregoing statute has been construed in keeping with the plain language therein employed in Nowabbi v.

State, 31 Okla. Cr. 158, 237 P. 868, wherein this court said:

"Where, in the trial of a capital case, a jury is permitted to separate prior to the final submission of the cause, the burden is on the defendant to show prejudice or misconduct likely to result in prejudice. When a jury is permitted to separate after the case is finally submitted to them, prejudice is presumed and the burden is on the state to show that no prejudice in fact resulted."

In Wilcox v. State, 69 Okla. Cr. 1, 99 P. 2d 531, 536, it is further said:

"Before the final submission of a case the legal presumption is that jurors perform their duty in accordance with the oath they have taken, and that presumption is not overcome by proof of the mere fact that during an adjournment of the trial the jurors were permitted to separate. The defendant must affirmatively show that by reason thereof he was denied a fair and impartial trial, or that his substantial rights were prejudiced."

The latter case is cited with approval in Gallagher v. State, 81 Okla. Cr. 15, 159 P. 2d 562. The record shows the defendant completely failed to sustain the burden placed upon him by law.

Finally, the defendant contends that the special prosecutor made remarks in his closing argument which constituted prejudicial error. The Attorney General correctly states that the result of such a contention depends upon the facts in each particular case. He relies upon Kennamer v. State, 59 Okla. Cr. 146, 57 P. 2d 646, 648, syllabus 12, as follows:

"The right of argument contemplates a liberal freedom of speech, and the range of discussion, illustration, and argumentation is wide. Counsel for both the state and the defendant have a right to discuss fully from their standpoint the evidence and the inferences and deduc-

tions arising from it. It is only when argument by counsel for the state is grossly improper and unwarranted upon some point which may have affected defendant's rights that a reversal can be based on improper argument."

He also contends that it appears from the record that some of the remarks were provoked and fall within the rule of Woodruff v. State, 56 Okla. Cr. 409, 41 P. 2d 129, reading as follows:

"Where improper remarks made by a prosecuting attorney to a jury have been provoked by and are in reply to remarks made by defendant's counsel, such remarks of the county attorney are not ordinarily ground for new trial."

In this contention he finds some support in the record. This court said, in Turpen v. State, 89 Okla. Cr. 6, 204 P. 2d 298, 299:

"Counsel for state and defendant are entitled to great latitude and a wide freedom of expression in presenting their arguments to the jury. However, this latitude given to counsel does not authorize the use of prejudicial statements calculated to inflame the passion of the jury."

In this connection the closing argument of the special prosecutor transcends and goes far beyond the rule announced in the case relied on by the Attorney General to sustain the special prosecutor's conduct. The prosecutor made unnecessary statements reflecting on the professional integrity of counsel for the defendant insinuating that the defendant's statement relative to the provocation of his rebuke administered to Riley about being careful in his association with Mrs. Whaley because Riley had a venereal disease became a factual issue in the case only after the defendant had discussed the matter with counsel for the defendant. This was highly prejudicial and improper. Counsel should refrain from casting re-

flections upon opposing counsel. Rogers v. State, supra. Further counsel for the defendant informed the jury that the district judge had denied the defendant bail which was highly improper, since it necessarily led the jury to believe in the defendant's guilt. It was not an issue in the trial, and was entirely irrelevant. Moreover, he injected the fact that the codefendant's attorneys had attempted to get Tommie Burke's case dismissed which attempt was overruled by the trial court. But he did not stop there. He went so far as to cite the proceedings in relation thereto and the outcome thereof upon application for bail to the Criminal Court of Appeals. Thus leading the jury to believe the state had a strong case against Burke. Furthermore, he criticised defense counsel to the jury for his failure to introduce into the State Senate a bill to abolish "beer joints" in Oklahoma. This likewise was irrelevant and not pertinent to the issues involved. This court has held it improper in a closing argument to present facts not pertinent to the issues and which are not in evidence. Green v. State, 39 Okla. Cr. 430, 266 P. 512; Bilton v. Territory, 1 Okla. Cr. 566, 99 P. 163; Murray v. State, 24 Okla. Cr. 113, 217 P. 891; Thomas v. State, 34 Okla. Cr. 63, 244 P. 1116; Cline v. State, 57 Okla. Cr. 206, 47 P. 2d 191, and numerous other cases of similar import. Moreover, the special prosecutor repeatedly expressed his personal opinion as to the defendant being a coldblooded brutal murderer which the record does not support, and which statements have been repeatedly condemned by this court. Glasgow v. State, 88 Okla. Cr. 279, 202 P. 2d 999; Thurmond v. State, 57 Okla. Cr. 388, 48 P. 2d 845, and many other cases. Then, too, the special prosecutor commented on the failure of the defendant to produce his codefendant as a witness. Where a severance is granted as by law provided and thus they would be separately tried, such

comment was not legitimate argument as was said in Dunkin v. State, 51 Okla. Cr. 457, 2 P. 2d 285 as follows:

"Where defendants are charged in the same information and tried separately, a codefendant is a competent witness only with his own consent; where defendants are charged in the same information and tried separately, a codefendant may not be required to testify while action is pending against him; comment on defendant's failure to call his codefendant, not on trial, as a witness is not legitimate argument. * * *"

But such comment is not necessarily reversible error unless it may influence the jury's verdict in a close case. Simpson v. State, 40 Okla. Cr. 58, 266 P. 783, and wherein it was further stated at page 65 of 40 Okla. Cr., page 785, of 266 P.:

"Complaint is also made that there is misconduct of the county attorney in his argument in commenting on the failure of defendant to call his codefendant, Roy Williams, as a witness. A codefendant, against his will, cannot be compelled to testify, and, where two or more persons are included in the same information, and are tried separately, the failure of a defendant to call his codefendant as a witness is not a circumstance from which unfavorable inferences may be drawn nor any legitimate argument against a defendant made. The comment is misconduct. Slight investigation by the county attorney will inform him that this comment is not legitimate argument. Buxton v. State, 11 Okla. Cr. 85, 143 P. 58; Irvin v. State, 11 Okla. Cr. 301, 146 P. 453; Hopkins v. State, 11 Okla. Cr. 385, 146 P. 917; Wells v. State, 29 Okla. Cr. 11, 231 P. 1087."

Moreover, the special prosecutor argued that if the defendant had stayed in Pittsburg county the taxpayers of Latimer county would have been several hundred dollars better off. This was not an arguable issue in the case which was palpably plain to counsel, and could have

been made only for the purpose of prejudicing the jury. Appeals to prejudices based upon a jury's county loyalty to a resident decedent in a homicide case as against a defendant a resident of an adjacent county, combined with an appeal to the jury's normal antipathy to paying taxes, could only be calculated to prejudice the defendant. These and other prejudicial statements constitute a part of the closing argument by the special prosecutor for the state. This argument went far beyond the bounds of propriety. Here the special prosecutor became a partisan and not an officer of the court. Prosecutors both elected and special are not to play the role of a partisan but, as is said in Vickers v. State, 1 Okla. Cr. 452, 98 P. 467, 473:

"A public prosecutor is presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action, to become a heated partisan, and by vituperation of the prisoner, and appeals to prejudice, seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and seeks no conviction through the aid of passion, sympathy, or resentment. The only way to secure fair trials is to set aside the verdicts so procured."

Special prosecutors are bound by the same rules of conduct in arguments as are regular prosecutors, as was said in Watson v. State, 7 Okla. Cr. 590, 124 P. 1101:

"When special counsel assists a prosecuting attorney in the trial of a criminal case, such counsel represents the county attorney and is governed by the same rules of propriety.

"However strong the prosecuting attorney's belief may be of the prisoner's guilt, he must remember that, though unfair trials may happen to result in doing justice in particular cases, yet justice so obtained is dangerous to the whole community. It matters not how

guilty a person on trial charged with crime may be, he is entitled to a fair and impartial trial, and a judgment of conviction for murder, and the imposition of a life sentence, would be as great a wrong to society if unfairly secured, although the accused might be guilty, as it would be for such person to go unwhipped of justice."

That the closing argument of the special prosecutor was improper cannot be denied. Notwithstanding the prejudicial nature of the cross-examination resorted to in the trial of this case, and the prejudicial nature of the argument of the special prosecutor, in light of the whole record, we believe the argument in no way influenced the jury's verdict of guilty, and if the case were tried over ever so many times the conclusion would be reached that the killing was the result of a drunken brawl, and that the defendant used more force than was necessary to repel the assault made upon him and his guilt therefore would be inescapable. However, we have no doubt that the vicious nature of the cross-examination, the appeal to prejudice, sympathy, and reference to matters clearly outside the record resorted to in the argument, influenced the jury in fixing the penalty. We are constrained to believe if the defendant had been accorded that measure of fairness which the law entitles him to, the jury would not have fixed his penalty at 25 years in the penitentiary. In fact, we doubt seriously that had it not been for the cross-examination and the incendiary argument made by the special prosecutor that they would have given him much more than four years, the minimum provided by the statute for first degree manslaughter. Title 21, § 715, O.S.A. 1941. Furthermore the record clearly shows the killing was not intentional, but that more force was used than was necessary to repel the assault, hence under the authority vested in this court by Title 22, § 1066, O. S. A. 1941, the judgment and sentence herein imposed should

be and hereby is modified to six years in the State Penitentiary; and as so modified the judgment and sentence is affirmed.

JONES, P. J., and POWELL, J., concur.