William Yuvvine HAMMONS, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–508.

Court of Criminal Appeals of Oklahoma.

Feb. 28, 1977.

Rehearing Denied March 16, 1977.

**1026**

John M. Johnston, Linn, Helms, Kirk & Burkett, Oklahoma City, for appellant.

Larry Derryberry, Atty. Gen., Frank Muret, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, William Yuvvine Hammons, hereinafter referred to as defendant, was charged, tried and convicted in the District Court, Pittsburg County, Case No. F–75–116, for the offense of Murder in the First Degree, in violation of 21 O.S.Supp.1973, § 701.1. His punishment was fixed at death by electrocution in accordance with the statute. From said judgment and sentence, an appeal has been filed with this Court.

From the testimony and evidence presented at trial, the State's case was as follows. The defendant, a slender black male approximately six feet tall, was living in Oklahoma City with Foye Reed and her four children in the early part of 1975. On one occasion in March, 1975, the defendant had driven Reed and her children to McAlester in his reddish-orange Dodge Charger to visit relatives of the defendant. During this visit the defendant had Reed drive him around McAlester so that he could check the security systems of various stores. The defendant also asked Reed to assist him in the robbery of a Safeway Store, but she refused. The defendant told her that when he committed a robbery he used Band-aids to cover the scars on his face.

After their return to Oklahoma City, the defendant had Reed buy .38 caliber bullets from a Gibson's store. Reed paid $7.07 for .38 shorts, even though the defendant had specified .38 longs. Reed did not see the defendant load the gun, a silver Smith and Wesson with a barrel approximately four inches long, which he frequently kept in the console of his car.

On May 13, 1975, Alice Lake, a clerk at the Grand Market Discount Grocery on Carl Albert Street in McAlester, saw the defendant with tape strips covering his face enter the store at approximately 8:40 p.m. Joye Darken, a customer in the store, was approaching a checkout stand when she heard loud footsteps behind her. She turned and saw the defendant. He passed her, went to the checkout stand and pulled a gun, matching the description of the Smith and Wesson which Reed had seen, on Lake and Pauline Harris, wife of the store manager. Upon defendant's demand, Mrs. Harris put the money from the cash register into a paper sack, which she gave to the defendant. After Mrs. Harris showed him that the other cash registers were empty, the defendant forced the three women, at gunpoint, to the store office at the rear of the store.

The defendant ordered Mrs. Harris to unlock the office door, but she told him she did not work at the store or have any keys to it. She suggested that the manager had the keys. The defendant told her, "Lady, you are dead if you don't find me the keys." The defendant had an unknown substance in his mouth, covering his teeth which kept slipping and made it difficult for the women to understand him. When Mrs. Darken pointed this out to the defendant, he pointed the gun at her and told her to "cool it." He told the women that he was going to take them to the store basement and kill them, that he had killed a man already and told them they were dead and he was going to kill them.

The women were forced by the defendant down into the basement, where they saw Leroy Harris, the store manager, lying in a pool of blood with his arms at his sides. According to the witness' testimony, Darken saw a bloody spot in the victim's shirt and a hole in the cloth. The defendant made Lake and Darken stand by the victim's head while he kept his gun on Mrs. Harris and ordered her to search her husband's body for the keys, which she found.

The group then returned upstairs to the office, but Mrs. Harris, nearly fainting, could not get the door unlocked. The de-

fendant pointed the gun at her and said, "[You are] dead, I'll kill you."

The defendant forced two male customers, whom he had noticed in the aisles of the store, and the three women back into the basement room. While Mrs. Harris searched her husband's body for more keys, the defendant felt the victim's neck and said, "He is dead, I shot him, this man's dead." He also took from the male customers the money in their billfolds.

On returning to the office upstairs, Kim Allen Sveiven, one of the male prisoners, took the second set of keys from Mrs. Harris and unlocked the door. While Mrs. Harris was attempting to find the key to unlock the office safe, the defendant ordered a third male customer and two children, a boy and a girl, into the office with his other prisoners. The boy offered the defendant a $5.00 bill, but the defendant refused it, saying that he did not kill children. The defendant pointed his weapon at each of the adults in the office. One male prisoner suggested that he try the keys on the safe because Mrs. Harris had nearly fainted. The defendant agreed, but when the safe still could not be opened, he demanded the keys, threatening to kill the group. Darken fell to her knees and began praying for the defendant, who pointed his gun at her and said, "You do that, lady, you do that." The defendant then fled the office, locking the prisoners inside.

Johnny Harden testified that he saw the defendant, wearing a stocking cap and carrying something, run from an alley near the grocery store, get into a white over orange Dodge Charger with a stripe around the rear section, and drive away at a high rate of speed, running a stop sign.

On Highway 270, approximately five miles west of McAlester, the defendant got stuck near the home of Freddie Sanders, who watched the defendant for a period of more than thirty minutes attempt to free his vehicle. Around midnight, the defendant went to the home of Homer Trout and asked to use Trout's telephone. Since Trout's telephone was out of order, he drove the defendant to the McAlester bus station.

The next morning defendant went to a salvage and wrecker service operated by Warner Scott, and together they went in search of defendant's car in Scott's wrecker truck. When they arrived at the location where the vehicle was stuck, the police arrested the defendant. The defendant subsequently gave the police permission to search his car. Among the items produced during the search was an end flap to an ammunition box, which read .38 S & W 146 grain lead and which had a price tag showing that it had come from Gibson's and had cost $7.07. The Oklahoma State Bureau of Investigation traced the flap to the Gibson's store in Oklahoma City and, eventually, to Foye Reed.

Dr. Merlin Bellamy, a physician specializing in pathology, examined the body of Leroy Harris, and determined the cause of death to have been a single gunshot wound from which he recovered the bullet. A firearms expert of the OSBI identified the bullet as a .38 S & W 146 grain lead bullet.

At trial, the defense established that the fatal shot was fired at close range, that a .38 pistol found at the home of the defendant's brother-in-law had not fired the fatal bullet, and that no test had been conducted to determine if the fatal shot could have been heard in the main portion of the store above the music system and other mechanical noises. In addition, a medical examination of the defendant's face and mouth revealed no traces of any foreign substances.

■ Defendant's first assignment of error is that the participation of a special prosecutor, employed by the widow of the victim, was prejudicial to the defendant's rights. James E. Gotcher, a McAlester attorney, had been the consulting attorney of Leroy and Pauline Harris for a number of years. During an in camera hearing prior to trial, Gotcher testified that he had been hired by Mrs. Harris, "to prosecute this case, look after her interests in this case; and assist the District Attorney in the prosecution as Special Prosecutor." He testi-

fied that his fee, which he had already been paid, was fixed and did not depend upon the outcome of the trial. The defense extensively examined Gotcher as to the insurance claims which other members of his firm were handling for Mrs. Harris, in relation to her husband's death. Gotcher stated that his firm was not handling the matter on a contingency basis and that regardless of the amount which Mrs. Harris received on the insurance policies she would be charged only a "fee for mailing, for filling out applications for proceeds. If she gets $1.00 from an insurance company or gets one million dollars, it makes absolutely no difference what I charge her. . . . I am charging for office work and if this man is convicted, it will be the same fee. If he is acquitted, it will be the same fee; or if someone proves it was self-inflicted, it will be the same fee . . . ." (Tr. 21) Based upon testimony, the trial court determined that Gotcher did not have a pecuniary interest which would require his exclusion from the trial. as a special prosecutor under this Court's holding in *Born v. State,* Okl.Cr., 397 P.2d 924 (1964).

Counsel for the defendant argues that the trial court failed to take into consideration the pecuniary interest of the special prosecutor's client. Instead of citing evidence to support his position, counsel poses a hypothetical situation which finds little support in the record before this Court. He asks this Court to assume that the insurance claims of the widow were substantial. He then argues that if the defendant had been acquitted the insurance companies might have investigated the possibility that Mrs. Harris could be directly or indirectly involved. That would, of course, delay her receipt of the proceeds from any of those policies. He concludes that "It was certainly in Mrs. Harris' best pecuniary interest to have a reasonably quick formal adjudication that her husband had been murdered by [the defendant]."

In *Born v. State,* supra, the trial court denied a defense request to inquire into the pecuniary interest of a special prosecutor. On appeal to this Court, evidence was presented which established that the special prosecutor "had a profound interest in obtaining a conviction of the defendant. His clients stood to benefit by being the sole beneficiaries of deceased's estate in case of a conviction. If defendant had been exonerated, she [the client of the special prosecutor] would have inherited a wife's share, whereas a conviction would have precluded her from participating in the estate." *Id.* at 941. This Court found that the participation of the special prosecutor had not prejudiced the rights of the defendant, but modified the sentence because the defendant had been denied the opportunity of establishing the pecuniary interest of the special prosecutor or his client. To read the *Born* case as precedent to appeal on a hypothetical possibility of pecuniary interest—either on the part of the special prosecutor or his client—would require this Court to completely ignore the factual situation upon which the *Born* decision was rendered, an impermissible action this Court will not take. Even if such a procedure were followed, *arguendo,* a careful reading of the record fails to disclose any action by the special prosecutor during the course of the trial which would warrant either a modification of sentence or a reversal of conviction.

■ This Court finds no merit in counsel's second argument that in a small city such as McAlester the impact of a special prosecutor "hired by the grieving widow to avenge her husband's death in open court carries an undeterminable amount of emotional impact on the court and jury." There is nothing in the record to suggest that any member of the jury was aware of Gotcher's status. Indeed, assuming that the size of McAlester is relevant to this issue, the voir dire examination established that none of the jurors was personally acquainted with either the victim or his widow, or knew either by more than sight. This Court fails to see how the presence of a special prosecutor, hired by someone unknown to the jury, could have any impact, emotional or prejudicial—upon that jury. After careful consideration of the record and the arguments of counsel for the de-

fendant, this Court finds the first assignment of error to be without merit.

▇▇▇ Defendant's second assignment of error is that the trial court improperly denied the defendant's motion for a change of venue, based upon alleged prejudicial pretrial publicity, which was filed without supporting affidavits as required by 22 O.S. 1971, § 561. In support of the motion, the defense introduced seven newspaper articles, which included accounts of the murder and robbery, the arrest of defendant, the defendant's prior criminal record, and photographs of the defendant made while he was in custody for the previous offenses.

A careful examination of the record reveals that the trial court did not summarily dismiss the defendant's motion, but took the matter under advisement. After an extensive voir dire, the trial court denied the motion. The procedure followed by the trial court is in accordance with that recommended by this Court on numerous occasions. See, e. g., *Johnson v. State*, Okl.Cr., 556 P.2d 1285 (1976).

When considering a motion for a change of venue, the presumption of law is that a defendant can get a fair and impartial trial in the county in which the offense charged was committed. The presumption is rebuttable, but the burden of persuasion is upon the the the defendant. *Fry v. State*, 91 Okl.Cr. 326, 218 P.2d 643 (1950). A mere showing that pretrial publicity was adverse to the defendant is not enough. *Shapard v. State*, Okl.Cr., 437 P.2d 565 (1967). The defendant must show by clear and convincing evidence that jurors were specifically exposed to the publicity and that he was thereby prejudiced. *Tomlinson v. State*, Okl.Cr., 554 P.2d 798 (1976). The granting of a change of venue is a discretionary matter within the powers of the trial court and unless it is clear from the record that the trial court has abused its discretion, or committed error in judgment, this Court will not overrule the trial court, especially where there has been an extensive voir dire examination to determine the prejudicial effect of the pretrial publicity. *Shapard v. State*, supra.

In the case at bar, the trial court permitted wide latitude in the questioning during the voir dire. Most of the potential jurors admitted to having been exposed to some form of publicity concerning the case. The final jury panel and the two alternates all indicated that they could put aside any opinion they had formed, and would render a verdict based upon the evidence presented during the trial, the standard required by this Court. See, *Sam v. State*, Okl.Cr., 510 P.2d 978 (1973).

After an exhaustive review of the record and defendant's argument, this Court cannot find that the trial court abused its discretion in denying the motion for a change of venue, nor can we find that the jury was so prejudiced by pretrial publicity that a reversal and retrial of the conviction is required.

▇▇ In his third assignment of error defendant contends that the trial court improperly admitted evidence of other crimes when it allowed Foye Reed to testify of the defendant's activities in McAlester during their visit in March of 1976. A careful review of the testimony reveals that the testimony dealt with actions taken in preparation of possible future criminal activity, and as such it is not evidence of other crimes and was admissible. We find that the testimony was relevant in that it could show, if believed by the jury, the defendant's predisposition to commit a robbery, and was properly admitted.

▇▇ Defendant's fourth assignment of error is that the trial court, upon its own motion, should have instructed the jury on the offense of second degree murder. This Court has frequently held that where the evidence in light of the entire record would justify an instruction on a lesser included offense, and such an instruction was not given, failure to give such an instruction will be grounds for reversing the case for a new trial, if the defendant has been deprived of a fundamental right. See, *Jackson v. State*, Okl.Cr., 554 P.2d 39 (1976). In the case at bar, this Court finds the evidence in the record is more than sufficient to support the State's charge of murder in

the first degree. The defendant was predisposed to commit robbery, he possessed a handgun for which he had someone purchase bullets of the type that killed the victim, he was identified as the person who robbed the victim's store, and he admitted shooting the victim in front of numerous witnesses during the robbery. The evidence thus satisfies the provisions of 21 O.S.Supp.1973, § 701.3, establishing the robbery and the homicide. In addition, there is no evidence in the record to negate any of the elements required to prove first degree murder. Therefore, this Court finds that the defendant was not entitled to an instruction on second degree murder, and that it was not incumbent upon the trial court to give such an instruction upon its own motion.

 Defendant's final assignment of error is a challenge to the constitutionality of 21 O.S.Supp.1973, § 701.1, and seeks a modification of the death sentence to life imprisonment. In light of this Court's holding in *Riggs v. Branch,* Okl.Cr., 554 P.2d 823 (1976), rendered after the United States Supreme Court struck down punishment by death, the sentence of the defendant is hereby ordered modified to Life imprisonment.

For all the above and foregoing reasons, the judgment and sentence appealed from is, accordingly, AFFIRMED as MODIFIED.

BUSSEY, P. J., concurs.

BRETT, J., specially concurs.

BRETT, Judge, specially concurring:

I am concurring in this decision because the evidence against the defendant is strong and convincing, but notwithstanding I find no authority in the present statutes that authorizes a special prosecutor. Likewise, *Born v. State,* having been decided long before the present District Attorney Act was passed, has little application to the instant case. It is no longer a question of whether or not the special prosecutor has a pecuniary interest in the outcome of the prosecution because there is no authority for the participation of a special prosecutor.

In my special concurrence to *Wade v. State,* Okl.Cr., 556 P.2d 275 (1976), I gave some resume of the special prosecutor lack of authority. In that case I concurred but recommended a reduction of the sentence. In the instant case the sentence has been modified to life imprisonment, so I therefore concur in this modification.