**Claude Eugene DENNIS, Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–76–402.**

Court of Criminal Appeals of Oklahoma.

March 2, 1977.

Charles R. Lane, Court Appointed, Duncan, for appellant.

Larry Derryberry, Atty. Gen., Bill J. Bruce, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, Claude Eugene Dennis, hereinafter referred to as the defendant, was charged in the District Court, Stephens County, Case No. CRF–75–50, with the crime of Murder in the First Degree. The case was tried before a jury. A verdict of guilty of First Degree Manslaughter was returned. Punishment was set at fifty (50) years' imprisonment. From said judgment and sentence a timely appeal has been perfected to this Court.

For the purpose of brevity, we will merely summarize the evidence presented at trial.

On January 31, 1975, the bodies of John Witt and Mary Littrell were discovered in a farm house located near the small village of Doyle, which is 19 miles east of Marlow on Highway 29 in Stephens County. Witt and Littrell had just recently taken up residence there. The discovery of the bodies was made by David Huffman, the 13 year old son of Burl Moody, owner of the farm. The previous owner of the farm had been the defendant. The defendant had purchased the farm from Moody in about January of 1974 on a contract for deed. On December 31, 1974, the defendant moved from the farm, being unable to meet the terms of the contract. Shortly thereafter, Burl Moody permitted the decedents to occupy the dwelling. At that time, Moody gave a shotgun to John Witt. Moody identified the gun at trial, which was then introduced into evidence.

After the initial discovery of the bodies, both the Stephens County Sheriff and Agents of the Oklahoma State Bureau of Investigation were called in to investigate. The initial investigation included the determination that the victims' car, a red Mark I Mustang with California plates, was missing. It was also determined that the victims had been shot with at least two different kinds of weapons, one being a shotgun and the other some sort of rifle. At the trial the crime scene was described in minute detail by several of the State's officers. Photographs taken at the scene were also introduced into evidence.

Two different physicians gave testimony. One had made an initial investigation of the victims while the bodies were still in the farm house. The other had done an autopsy the following day. His testimony included identification of several slugs which he had removed from the bodies. Other slugs and pieces of slugs were recovered from the crime scene. These too, were introduced into evidence. The pathologist who conducted the autopsy stated that each victim had been hit with one shotgun blast, and each had been struck twice by "high velocity metallic projectiles." The pathologist further stated that with regards to Henry Witt, any one of three gunshot wounds inflicted would have been fatal in and of itself. The Doctor further stated that the shotgun wound received by the woman would not have been fatal, but that either of the other two shots would have.

On February 7, 1975, the defendant was arrested at his brother-in-law's home in Silo, Bryan County, Oklahoma. Bryan County Sheriff Highfill testified that the defendant's wife had filed a missing person's report on the defendant after he had left home on January 24th and not returned. The defendant's wife mentioned to Sheriff Highfill that when the defendant left he was on foot and was carrying his .6 millimeter rifle. This report was not filed until several days after the defendant had left home. On February 7th, the defendant's wife notified Sheriff Highfill, as requested by him, that the defendant was at his brother-in-law's home. Sheriff Highfill also received information on the 7th that a red Mark I Mustang had been discovered deserted on a county road about one mile from the defendant's brother-in-law's home. Sheriff Highfill was aware that the car was being sought by O. S. B. I., so he notified them. Sheriff Highfill arrested the defendant as a suspect in a murder which had occurred in Bryan County on the day the defendant left home. This fact was not, of course, brought before the jury. When the arrest occurred, Sheriff Highfill seized a rifle which belonged to the defendant. The rifle had a sling which appeared to be constructed of automobile seat belts.

The defendant was brought to the Bryan County Jail at about 2:30 p. m. There he refused to make a statement. At approximately 5:00 p. m., O. S. B. I. Agent Sires arrived. Agent Sires was investigating the Stephens County murders of Witt and Littrell. He had learned that the defendant had formally owned the farm house in which the bodies were discovered, and that the defendant was missing, and had a rifle which was similar to the one which was used to kill Witt and Littrell. Sires spoke with Mrs. Dennis in Bryan County on February 5th, and asked her to call him if the defendant returned. She called him on the 7th, telling him that the defendant was at his brother-in-laws. When Sires arrived at the Bryan County Jail on February 7th, he advised the defendant of his Miranda rights. Sires asked the defendant where he had been since leaving home. The defend-

ant stated in essence that he had been in Texas.

Oklahoma State Bureau Investigator Lovett and Stephens County Sheriff Landis, having been notified on February 7th, that the victims' car had been located in Bryan County, proceeded to Durant, arriving at the Bryan County Sheriff's Office shortly after Agent Sires arrived. Agent Lovett asked the defendant several questions, but received no positive statement. The O. S. B. I. Agents, Sheriff Landis and Sheriff Highfill left the Bryan County Sheriff's Office at approximately 6:00 p. m. and proceeded to the location where the victims' car was located. There, they made a brief inspection, noting that the seat belts were missing. They then called for a wrecker to have it towed into Durant. The officers then proceeded to the defendant's brother-in-law's home, located approximately one mile distant. There, they examined numerous articles which the defendant had brought with him when he arrived there that morning of the 7th. Included were a pair of Arctic pants, in the pocket of which were several articles, including pieces of seat belt webbing, and two spent .16 gauge Federal shotgun shells. These articles and others were seized.

The officers then went back to Durant. While eating in a cafe there, they were told by a man named Tom Burge that he had seen a man who resembled the defendant in the Mark I Mustang with California license plates the night before in Denison, Texas, and that he had talked to this man for several hours.

Upon returning to the Bryan County Courthouse at approximately 10:00 p. m., the defendant was rearrested for the murders in Stephens County. Sheriff Landis and Agent Lovett transported the defendant back to Duncan. Before entering the car, the defendant was advised of his rights again, and of the charge. On the way back to Duncan, the defendant confessed to Lovett and Landis. Lovett repeated this confession at the trial, after an appropriate hearing to determine its admissibility.

The State also introduced into evidence through an O. S. B. I. Agent that the two .16 gauge shotgun shells recovered from the Arctic pants had been fired from the shotgun which was identified by Burl Moody, the owner of the farm, as being the one which he gave to the victims. The Oklahoma State Bureau of Investigation Firearms Examiner was unable to conclusively state that the rifle slugs recovered from the scene had been fired from the .6 millimeter rifle which the defendant was carrying. By the same token, he was unable to state that they had not been fired from that gun.

Several of the State's witnesses testified that they saw the defendant walking in the area of the killing carrying a rifle on the day prior to when the bodies were discovered. Tom Burge, the man who claimed to have seen the defendant in the victims' car in Denison, Texas on February 6th, also testified.

The confession which the defendant gave to Sheriff Landis and Agent Lovett was repeated by Lovett from the witness stand. It related that the defendant left his home on January 24th, intending to walk to his brother-in-law's. There, he had hoped to borrow the car to drive to Oklahoma City in order to investigate the possibility of getting back his own car which had been recently repossessed. However, while walking toward his brother-in-law's, he decided to forego the ride, and walk to Oklahoma City. The defendant related to Lovett and Landis how he walked in a generally northwesterly direction after leaving his home near Mead, Oklahoma. He passed through or near to the towns of Fort Washita, Madill, Mill Creek, Sulphur, Wynnewood, Elmore City, and Foster. It was around Wynnewood that the defendant decided to forego his trip into Oklahoma City. Instead he proceeded west toward Doyle, in order to check on some personal items which he had left with a neighbor when he moved from the farm house. Agent Lovett testified that the defendant said he had spent the night of January 30th in an abandoned farm house. On January 31st the defendant walked to the Witt/Littrell farm house arriving at about 11:30 a. m. When he arrived he knocked upon a rear door, and receiving no answer, walked in. He leaned his rifle up against a wall, and picked up a shotgun, looking to see if it was loaded. While the defendant was checking out some rear rooms, the occupants arrived. The defendant told Lovett that he panicked, and shot each once with a shotgun. He then shot them with his own rifle. Running outside, the defendant saw the victims' car. He got in and drove southeast, taking a varied route. The defendant admitted to Lovett that he had met Tom Burge in Denison, Texas. The defendant related to Lovett how on February 6th, he drove the car to where it was eventually discovered. The defendant removed the car seat belts in order to carry to his brother-in-law's the many items which he had accumulated. The defendant told Lovett that he had thrown the shotgun into Lake Texhoma.

The defense was self-defense. The defendant presented numerous character witnesses. The defendant also presented testimony as to the violent reputation of the deceased, as well as evidence that Mary Littrell carried a .22 caliber revolver. The defendant took the stand in his own behalf. His testimony as to the events occurring during the period of January 24th through February 7th largely mirrored his alleged confession which was testified to by Agent Lovett. However, on the stand the defendant testified that when he arrived at the Witt farm house, both occupants were home. The man was working in a nearby barn. The woman invited him in for coffee. He asked for and received permission to use the bathroom. As he was coming out, he testified, Henry Witt came charging at him with his own rifle which he had left leaning against a wall. The defendant related how he had jumped to the right, and became entangled in a shotgun. He picked up the shotgun and decided to fight back instead of running. He shot Mr. Witt, and then Mrs. Littrell, who was aiming a .22 caliber revolver at him. He then dove for his own rifle which Witt had dropped, and shot Mrs. Littrell again. After that, the defendant

related how he went into shock and stated that he could not remember what exactly happened thereafter. His account of taking the car and driving to Texas was largely corroborative of the alleged· confession given to Lovett. However, the defendant stated that he had taken the shotgun and pistol with him, and pawned them in Texas.

At the suggestions of the defendant, a .22 caliber revolver and .16 gauge shotgun had been recovered from pawn shops in Texas. The defense turned these over to the prosecution, and they were introduced into evidence. As previously stated, ballistic tests were made on the shotgun, and it was shown that two spent .16 gauge shotgun shells that were in the pocket of the defendant's Arctic pants which were recovered from his brother-in-law's house had been fired from this shotgun. In addition, Burl Moody, owner of the farm identified the shotgun as the one which he had given to Witt.

Thus, when the jury deliberated, there was no question but that the defendant did kill Witt and Littrell. The only issue was to his intent at the time. The defendant asked for and received instructions on First Degree Manslaughter and self-defense.

■ The defendant's first assignment of error is that the cross-examination of the defendant by the prosecutor was calculated to degrade and intimidate the defendant and thereby prejudiced the jury against him. The defendant made several objections during the cross-examination, and at the close thereof moved for a mistrial, which was denied. Counsel for the defendant asserts this as error. We find this assignment to be without merit. In his brief, the defendant set out the entire cross-examination. Thereafter he recited numerous cases which variously held that a prosecutor cannot repeatedly ask ·incompetent questions with the intent of insinuating facts which had not and could not be proven. *Love v. State*, Okl.Cr., 360 P.2d 954 (1961). However, after reciting these general principles of law in his brief, the defendant failed to correlate them to any of the actual testimony. The defendant asserts the prejudice may be found by examining the totality of the examination. We fail to find it. The prosecution is allowed to question the defendant who takes the stand as to prior statements which are inconsistent with the sworn testimony. *Gillaspy v. State*, 96 Okl.Cr. 347, 255 P.2d 302 (1953). The State may cross-examine a defendant as to any matter and issue which affects his credibility. The extent of cross-examination is left largely to the discretion of the trial court, and absent an abuse of discretion we cannot disturb his ruling. *Withers v. State*, Okl.Cr., 507 P.2d 552 (1973).

■ The defendant's second assignment of error is that the prosecutor's closing argument aroused the prejudice of the jury to the extent they were swayed from arriving at a fair verdict. In his closing argument the prosecutor made reference to a mythical "game plan" which the State had formulated in order to prosecute this case. The game plan broadly included the investigation of the crimes by the various State and County law enforcement officers, the presentation of it to the District Attorney, and the manner in which he decided to present the case to the jury. The insinuation was made by the District Attorney that the defendant had somehow obtained this "game plan" and he thereby was able to construct a defense with foreknowledge of where the prosecutor's "mines" and "guns" were located. The counsel for the defendant objected several times during the prosecutor's argument, complaining that the defendant had received what the prosecutor referred to as the "game plan" through appropriate discovery techniques. These objections were sustained, and the prosecutor admonished not to make any more references to the game plan. The jury was also admonished to disregard these comments.

In support of his contention that .the prosecutor's argument justifies a reduction in the sentence, the defendant cites *Fry v. State*, 91 Okl.Cr. 326, 218 P.2d 643 (1950). In *Fry*, supra, the defendant had been charged with Murder, and was convicted of

First Degree Manslaughter. The sentence was set at twenty-five (25) years. In reducing the sentence to six (6) years, the Court relied largely on gross improprieties in the prosecutor's argument. These included not only references to facts which were not in the evidence but also criticism of the conduct of the defense counsel, which conduct was totally irrelevant to the issues at hand.

It is true that some of the same kinds of prosecutorial arguments which the Court condemned in *Fry* are present in the instant case. However what must be borne in mind is that this Court in such a situation must determine the amount of prejudice which flowed from the impropriety. In *Fry*, supra, there was no question that only a manslaughter and not a murder had occurred. The deceased was killed during a fight when he was stabbed in the leg with a pen knife. The wound severed an artery and death resulted from a loss of blood. Both participants in the fight were drunk. There being no evidence of premeditation, any prejudice which occurred as a result of the improper argument could only have resulted in an exaggerated sentence.

Here, the State's case of First Degree Murder was much stronger. The victims had each been shot three times with two different weapons, which raises a strong inference of premeditation. Even supposing that the defendant initially fired the shotgun without an intent to kill, or, as the defense contended, in self-defense, defendant was hard put to explain why he then additionally shot each victim twice more. Mr. Witt may well have been dead after the first "unintentional" discharge of the shotgun. Mrs. Littrell, after being wounded superficially by the shotgun might have tried once again to "assault" defendant with the revolver, "justifying" her being shot by the defendant again. But, why then was she shot a third time? These inferences do not conclusively prove First Degree Murder, but they do cast considerable doubt upon the credibility of the defendant. Further, we only note these inferences in order to show that there exists considerable differences in the facts between the *Fry* case and the present case. Differences which show that in *Fry* a First Degree Manslaughter conviction was entirely justified under the facts, whereas in the instant case, the First Degree Manslaughter conviction was in all probability a compromise verdict reflecting only the jury's reluctance to assess the death penalty. Viewing the facts thusly and noting the border line quality of the case we are not convinced that an inordinate amount of prejudice flowed from the prosecutor's remarks. Had it been so a First Degree Murder conviction and penalty of death would in all probability have been returned.

■ The defendant's third assignment of error is totally without merit. His contention is that the trial court erred in failing to give an instruction of Second Degree Manslaughter. The defendant recites appropriate case law which holds that an instruction on a lesser included offense must be given even when the evidence in support thereof is "slight," *Cordray v. State*, Okl.Cr., 268 P.2d 316 (1954); and that the Court, in giving instructions, should give a defendant the benefit of any doubt which the evidence tends to suggest. *Ray v. State*, 86 Okl.Cr. 68, 189 P.2d 620 (1948). However the defendant failed to point out anything in the record which would be even slight evidence to which the Court could give the benefit of the doubt by instructing on Second Degree Manslaughter. After a careful reading of the record we too are unable to find such evidence.

The defendant's fourth assignment of error is that the Court failed to instruct on Second Degree Murder. His contention is that the evidence tended to show Murder in the Second Degree as per 21 O.S.Supp.1973, § 701.2 ¶ 2, which states that homicide is murder in the second degree:

"When perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual; . . . ."

■ The defendant misinterprets the purview of this statute. It is meant to

cover those situations where one commits acts imminently dangerous to others which evinced a depraved mind, but where there was no premeditated intent to kill any particular person. An example would be shooting into a crowd, where one does not intend to kill any particular person, but where death to someone is so probable that the law will infer an intent. See, *Jewell v. Territory*, 4 Okl.Cr. 53, 43 P. 1075 (1896); *Gibson v. State*, Okl.Cr., 476 P.2d 362 (1971).

█ Here, under either the defense's or State's theory of the case, the defendant intended to shoot at the very persons whom he admitted shooting. The defendant's contention was that he shot in self-defense, i. e., justifiable homicide, upon which an instruction was given. The State's theory was that the defendant premeditatively killed two persons in the same transaction. An instruction of First Degree Murder was therefore justified. There was also evidence of a lack of premeditation and thus a First Degree Manslaughter Instruction was mandated. However, simply because there was some doubt as to premeditation does not justify an instruction on Second Degree Murder, under 21 O.S.Supp.1973, § 701.2, ¶ 2. The facts must reasonably bring the case under those circumstances which the statute has historically been interpreted to cover, and primary among these circumstances is that the defendant's wrath be not directed against any particular person.

The defendant's fifth assignment of error is that the trial court erred in overruling the defendant's motion to suppress the .6 millimeter rifle that was seized by Bryan County Sheriff Highfill when he arrested the defendant on February 7, 1975. The defendant's contention is that his arrest was not based upon probable cause, and was thus illegal, and that evidence seized pursuant to this arrest was "fruit of the poisonous tree."

Assuming for the sake of argument that defendant's arrest and the seizure of the rifle were illegal, and that its subsequent admission into evidence was error, we cannot for that reason alone reverse this conviction. In order for error at trial to justify reversal, the reviewing court must be convinced that the error complained of substantially prejudiced the rights of the defendant, 20 O.S.1971, § 3001, Harmless Error. We fail to find such prejudice herein, largely because the defendant took the stand and admitted that he shot the victims using this rifle. Of course this claim was that he shot in self-defense. However this admission had the effect of removing from the jury's actual consideration the issue of whether or not the victims had been shot with this particular rifle. Further, it was only to this end that the rifle was introduced by the prosecution. Additionally, there was ample evidence from other witnesses to the effect that the defendant owned a .6 millimeter rifle, and that he had been seen in the area of the crime carrying a rifle.

█ It is thus unnecessary to decide whether or not the initial arrest was based upon probable cause. It is a well known tenet of Oklahoma Law that an illegal arrest will not act to defeat the jurisdiction of the trial court. *Turnbow v. State*, Okl.Cr., 514 P.2d 410 (1973). Thus, assuming without deciding that the arrest was illegal and that the rifle obtained pursuant thereto was illegally seized, we fail to see how its admission in this case substantially prejudiced the defendant, in light of the admissions he made upon the stand, and the type of, and the manner in which, the issues were presented to the jury.

The defendant's sixth contention on this appeal is that the trial court erred in allowing into evidence the testimony of Agent Lovett concerning the statement of the defendant taken while enroute from Bryan County to Stephens County. The statement was in the nature of a confession and was highly inculpatory. The defendant claims that the statement was given under circumstances amounting to duress and coercion, and it was thus involuntarily obtained. The trial court found otherwise after an appropriate in-camera hearing.

█ When there is sufficient evidence that the defendant knowingly and intelli-

gently waived his constitutional right against compelled self-incrimination, this Court will not disturb the trial court's ruling allowing into evidence the defendant's confession. *Castleberry v. State*, Okl.Cr., 522 P.2d 257 (1974). A review of the record in the present case convinces us that there is indeed ample evidence on which a viable waiver can be found.

■ The defendant was arrested at approximately 2:30 p. m., on February 7, 1975, by Bryan County Sheriff O. W. Highfill, and transported to the Bryan County Jail. He was arrested as a suspect in a murder in Bryan County. The trial court found that at the time of the arrest, the defendant was advised of his rights, although the record did not reflect which rights he was advised of. After arriving at the Sheriff's Office, the defendant declined to answer several questions which were asked by the Sheriff.

At about 5:00 p. m., Agent Mel Sires arrived. Agent Sires advised the defendant of his Miranda rights, and then asked the defendant where he had been since he had left home. The defendant gave a statement indicating that he had been down in Texas. Soon thereafter, Agent Lovett and Stephens County Sheriff Landis arrived. Lovett asked the defendant if he had been advised of rights. The defendant replied that he had, but thereafter declined to talk.

At about 10:30 p. m., after more investigation, Agent Lovett and Sheriff Landis decided that they had enough evidence to charge the defendant with the Witt/Littrell murders. Before transporting the defendant back to Stephens County, Agent Lovett again advised him of his Miranda rights. While enroute to Stephens County, the defendant was asked again where he had been since leaving home on January 24th. The defendant reiterated his story about walking to and remaining in Texas for the duration. At that time Sheriff Landis advised the defendant that Tom Burge had told the officers about seeing the defendant in Denison, Texas on the previous night driving a red Mark I Mustang with California plates. Sheriff Landis then asked the defendant if he would like to tell what really happened.

The defendant replied that he might as well, and thereafter he gave the purported confession which was restated by Agent Lovett at the trial.

After arriving at the Stephens County Jail at about 2:00 a. m., on February 8th, the substance of the confession was written down by one of the officers as the defendant restated it to him. The defendant then made corrections, initialed those, and signed the entire statement. Part of this process of transcription was recorded on tape. Neither the written statement nor the tape was introduced at trial. The record also indicates that from the time the defendant was arrested at about 2:30 p. m. until arriving in Stephens County at about 2:00 a. m. the defendant had nothing to eat.

The defendant's claim is that a view of the totality of the circumstances shows that the statement given was not voluntary. The defendant points out that neither the written statement nor the tape was introduced into evidence. He claims that the reason for this was because the tape showed the "putting words into the mouth of the defendant" procedures that were used by the officers when the written statement was constructed. The short answer to this is that the defendant had a copy of the tape and written statement, and had they been seriously exculpatory or contradictive of the oral statement, the defense should have, and would have, introduced them on his own behalf. Further, no objection was made by the defendant that tape or written statement was the best evidence.

The defendant's most serious contention is that the case of *Westover v. United States*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), mandates exclusion of this confession. In *Westover*, the defendant was arrested by local police and interrogated for fourteen hours without being advised of his rights. When the local police were finished, several F. B. I. agents took over. The Federal Agents gave Fifth Amendment warnings, and succeeded in obtaining a confession to a crime which the local police had not interrogated the de-

fendant about. In reversing the decision and excluding the confession, the Supreme Court held that for all intents and purposes the rights given by the F. B. I. agent came at the end of the interrogation, and thus any waiver thereof was not intelligently and voluntarily given.

The State seeks to rebut the defendant's contention that this case is factually analogous of *Westover*, by a citation to the more recent case of *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). In *Mosley*, the defendant was arrested, advised of his rights, and he thereafter declined to waive them. Questioning ceased for about two hours. Another detective then readvised the defendant of his Miranda rights, and proceeded to interrogate the defendant about an entirely different crime. The defendant Mosley, made several inculpatory statements concerning the second crime which formed the basis of his conviction. The Supreme Court ruled that these statements had been properly admitted into evidence, distinguishing *Westover*. Implicit in the holding was that police officers are allowed to question the suspect in custody about a crime when the defendant had theretofore declined to answer questions concerning another crime, provided that Miranda warnings are given before each interrogation begins.

The facts in the instant case are not, of course, completely analogous to either *Mosley*, supra or *Westover*, supra. However, if the Supreme Court's holding in *Mosley* may be taken to stand for the proposition annunciated above, then the ruling of the trial court in this case allowing into evidence the confession of the defendant must be affirmed. This is not the case, as in *Westover*, where the defendant was subject to lengthy interrogation before receiving any advice as to his constitutional rights. Rather, the record herein shows that the defendant was never subjected to grueling interrogation, and that he gave inculpatory statements only after being repeatedly advised of his rights, and after having been truthfully advised by police officers of the nature of some of the evidence which they had against him. Also, as in *Mosley*, there was a considerable lapse of time between when the defendant was questioned about the Bryan County homicide and when he was questioned concerning the present case. The only fact which may distinguish this case from *Mosley* is that in *Mosley* the initial interrogation by the arresting officer was preceded by Miranda rights notification, whereas in the present case, as the trial judge indicated at the completion of the in-camera hearing, rights were given to the defendant but the record did not indicate which ones in reference to Bryan County case. This however may be exalting form over substance inasmuch as the defendant refused to answer questions anyway. Further, it was not until Agent Sires arrived at about 5:00 p. m., that the defendant indicated in any way his whereabouts since leaving home, and the record clearly shows that before any questions concerning this case, Sires advised the defendant of his Miranda rights.

Lastly the record does not show that the defendant at any time absolutely and unequivocally declined to answer questions or to speak to the officers. While at the Bryan County Sheriff's Office, the defendant did not refuse to answer questions, but rather indicated that he had nothing more to say simply because he said all that he knew. The defendant's testimony and the testimony of Agent Lovett and Sheriff Landis show that while enroute from Bryan County to Stephens County, the defendant was in no way badgered or questioned. The defendant himself admits that prior to giving the statement the three men engaged in frivolous small talk, and that the atmosphere was not charged with tension and excitement.

On review then we cannot say that the trial court's finding of a waiver by the defendant of his Fifth Amendment rights is such an abuse of discretion as to require reversal.

The defendant's seventh contention is that the State's statute putting a ceiling

on the amount of compensation payable to a court appointed attorney in a criminal matter is unconstitutional. The defendant makes no claim that this ceiling had the effect of depriving him of fair trial or of the effect of assistance of counsel. Indeed, we cannot see how this argument could be reasonably advanced, as defense counsel did an excellent and thorough job in safeguarding the rights of his client at every stage in the trial. In any case since the argument is not made we find that the defendant herein is without standing to press this claim.

 The defendant's eighth assignment of error is that the trial court erred in failing to provide the jury with the requested testimony of the witnesses. The jury during deliberation had asked the court for the entire transcript. The court told them, and rightfully so, that there was no transcript. The defendant's contention herein is that the trial court should have advised the jury that it would be permissible to re-read to them certain portions of the testimony which they wish to hear, as per 22 O.S.1971, § 894. However, at the time the court's answer to the jury's request was given, the defendant, who was present, failed to raise any objection. Having failed to give the court an appropriate opportunity to correct itself the defendant cannot raise the issue here for the first time.

 The defendant's ninth assignment of error is that the trial court erred in refusing defendant's request for investigative funds. The sole reason given by the trial court for such refusal was that no Oklahoma Statute or case law provided for such investigative funds. The defendant cites numerous case from other jurisdictions which hold that court orders giving a defendant such funds are mandated by the constitutional rights to the effective assistance of counsel, to a fair trial, and to equal protection of the laws. See, State v. Rush, 46 N.J. 399, 217 A.2d 441 (1966). However none of the cases which the defendant cites in support of his assignment is controlling in Oklahoma.

In the case of Trowbridge v. State, Okl. Cr., 502 P.2d 495 (1972) we held, in the fact of a similar constitutional argument, that the trial court did not err in refusing the defendant's request for investigative funds. Citation was made in Trowbridge to United States ex rel Smith v. Baldi, 344 U.S. 561, 73 S.Ct. 391, 97 L.Ed.2d 549 (1953), wherein it was held that the State is under no constitutional duty to appoint a psychiatrist to make a pretrial examination of the defendant. We therefore find that no error was committed in denying to the defendant the requested funds.

 The defendant's tenth contention on this appeal is that the State failed to prove a premeditated design to effect the death of the persons killed, and that it was error to bind the defendant over for trial on First Degree Murder. The defendant points out that the only evidence of premeditation was the condition of the bodies. He argues that the condition thereof just as easily suggests a shoot out, and that this doubt being raised, there did not exist a sufficient quantum of evidence upon which to find premeditation.

In reviewing the transcript of the preliminary hearing we found no evidence suggesting a shoot out. Further, there is a statutory presumption in Oklahoma that "a design to effect death is inferred from the fact of the killing, unless the circumstances raised a reasonable doubt whether such design existed," 21 O.S.1971, § 702. The effect of this statute has been largely confined to killings perpetrated with deadly weapons, such as guns. See, Schmitt v. State, 57 Okl.Cr. 102, 47 P.2d 199 (1935). Of course, if the circumstances surrounding the homicide suggests something else, such as a killing committed in self-defense, or by accident, or in the heat of passion, then the inference is destroyed. But when two bodies are found in the condition in which the bodies of these victims were found and there were no guns in their proximity and no eyewitnesses to give testimony as to what occurred, there simply are no circumstances tending to rebut the inference that they were killed premeditatively. We

therefore find that under appropriate Oklahoma Statutory and case law that the condition of the bodies in this case, coupled with the lack of exigent circumstances, was enough evidence upon which to bind the defendant over for First Degree Murder.

■ The defendant's eleventh and final assignment of error concerns the gag order issued by the examining Magistrate prior to the preliminary hearing. The defendant contends that this order operated as direct prior restraint on the press, and that it was thus governed by the applicable law in that area, citing *Nebraska Press Association v. Stewart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). However, it must be noted that the controverted order in Nebraska Press Association is materially different from the order attested in this case, in that the order in *Nebraska Press Association* applied directly to the press itself, whereas the order here applies only to the various participants in the trial, except, of course, the defendant himself who remained free to speak to anyone about anything. We are further moved to dismiss this last assignment of the defendant because of the fact that he failed to give timely objection to the order when it was first issued. Failing to object then, the defendant cannot raise the matter for the first time on appeal.

For these and the foregoing reasons the judgment and sentence appealed from herein are *AFFIRMED.*

BUSSEY, P. J., and BRETT, J., concur.